The shares and options fully vest on the earliest to occur of (1) January 1, 2012, the New CEO start date, or the occurrence of a change in control. The Company valued the compensation in the amount of $700,000, representing the fair value of the 5,000,000 shares of common stock issued at $0.14 per share based on the grant date share price, and $686,896, representing the fair value of the 5,000,000 options granted to Mr. Rabin. These amounts will be recognized in compensation expense ratably over the vesting period.

*Legal Proceedings*

On October 1, 2007 Gary D. Aronson brought suit against the Company with respect to a dispute over the interpretation of the anti-dilution provisions of our warrants issued to Mr. Aronson on or about September 14, 2005. John S. Gorton initiated a similar suit on October 10, 2007. The two cases have been consolidated. The plaintiffs allege that the Company breached warrants to purchase securities issued by the Company to these individuals by not timely issuing stock after the warrants were exercised, failing to issue additional shares of stock in accordance with the terms of the warrants and failing to provide proper notice of certain events allegedly triggering Plaintiffs' purported rights to additional shares. The Plaintiffs withdrew their case the day before the trial date. The Company sought attorney fees relating to the Company defending the case over the past 2.5 years. The court denied the motion and the Company has appealed.

On December 22, 2010, Optimus CGII, Ltd. ("Optimus") purchased a claim previously brought against the Company in a civil action by Alexandria Real Estate-79/96 Charlestown Navy Yard ("ARE"). In that action, ARE alleged that it was unable to relet the premises and therefore seeking rent for the vacated premises since September 2008. ARE also sought certain clean-up and storage expenses. On December 23, 2010, Optimus and the Company settled the claim in the amount of $8,000,167. During December 2010, the Company issued 55,688,368 shares of its common stock to Optimus in full settlement of this claim. Accordingly, the Company recognized loss on settlement in the amount of $8,000,167 in its accompanying consolidated statements of operations for the year ended December 31, 2010. This settlement ended all claims previously brought against the Company by ARE, and Optimus as bona fide claimant.

The Company has been named as a third party defendant in this action, filed September 16, 2009, in which the plaintiff alleges that Alexandria Real Estate ("Alexandria") improperly charged a trustee holding approximately $146,000 of funds in a Company account that Bristol claimed as collateral. Alexandria brought a third party complaint against the Company for indemnification. The case has been dismissed as of December 31, 2010.

On March 9, 2009, plaintiffs filed a complaint and summons in the Supreme Court of the State of New York, County of New York against the Company and its subsidiary Mytogen, Inc. Plaintiffs' complaint alleges, among other things, that the Company has breached the terms of certain contracts with plaintiffs; namely, convertible debentures and a consulting agreement. Plaintiffs sought preliminary and permanent injunctive relief directing the Company to deliver to plaintiff Bristol Investment Fund, Ltd. ("Bristol") 2.5 million shares of its common stock, declaring a conversion price of $0.02 for the convertible debentures held by plaintiffs, and directing the Company to honor plaintiff's future conversion requests. Plaintiffs also sought compensatory damages in an amount to be determined at trial, but alleged in the complaint to exceed $1.5 million. On August 30, 2010, an investor was granted a preliminary injunction against the Company, whereby the Company delivered to the investor 49,220,665 shares of its common stock. Further, on September 30, 2010, under the terms of a final settlement and mutual release with the same investor, the Company exchanged a new convertible debenture to the investor in exchange for the investor's outstanding convertible debenture. The terms of the new convertible debenture are the same as the amended and restated debentures, except that the amounts under the debenture are due and payable on or before December 31, 2010 and June 30, 2011, and the conversion and redemption prices are subject to a floor price of $0.06 per share. Concurrently with the settlement and release, all common stock purchase warrants previously issued to the investor were cancelled (23,701,263 warrants in total) and the legal actions were dismissed. The Company recorded a loss on settlement in the amount of $3,132,300 during the year ended December 31, 2010 in its accompanying statement of operations.

The Company has entered into employment contracts with certain executives and research personnel. The contracts provide for salaries, bonuses and stock option grants, along with other employee benefits. The employment contracts generally have no set term and can be terminated by either party. There is a provision for payments of three months to one year of annual salary as severance if we terminate a contract without cause, along with the acceleration of certain unvested stock option grants.

16.    INCOME TAXES

The items accounting for the difference between income taxes computed at the federal statutory rate and the provision for income taxes were as follows:

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| Statutory federal income tax rate | (34) % | (34) % | (34) % |
| State income taxes, net of federal taxes | (6) % | (6) % | (6) % |
| Non-includable items | 18% | (25) % | 8% |
| Increase in valuation allowance | 22% | 65% | 32% |
| Effective income tax rate | - | - | - |

F - 35

Significant components of deferred tax assets and (liabilities) are as follows:

|  | 2010 | 2009 |
|---|---|---|
| Deferred tax assets: |  |  |
| Net operating loss carryforwards | $ 36,704,171 | $ 28,666,867 |
| Depreciation | 175,487 | 84,159 |
| Capitalized R&D expenses | 559,375 | 175,309 |
| Deferred revenue | 1,595,743 | 1,826,336 |
| Losses from joint venture | 64,498 | 133,414 |
| Shares issued in settlement of accounts payable | - | 4,102,264 |
| Professional fees paid in stock | 1,101,535 | 575,524 |
| Deferred interest and finance charges | - | - |
| Stock-based compensation | 1,412,064 | 1,341,125 |
| Reversal of unpaid liabilities | 1,184,298 | 1,582,754 |
| Valuation allowance | (42,797,172) | (38,487,752) |
| Net deferred tax asset | $ - | $ - |

The Company files income tax returns in the U.S. federal jurisdiction, and various state jurisdictions. With few exceptions, the Company is no longer subject to U.S. federal, state and local income tax examinations by tax authorities for years before 2003.

At December 31, 2010, the Company had federal and state net operating loss carry forwards available to offset future taxable income of approximately $93 million and $84 million respectively. These carry forwards will begin to expire in the years ending December 31, 2025 and December 31, 2015, respectively. These net operating losses are subject to various limitations on utilization based on ownership changes in the prior years under Internal Revenue Code Section 382. The Company is in the process of analyzing the impact of the ownership changes but management does not believe they will have a material impact on the Company's ability to utilize the net operating losses in the future.

F - 36

The Company periodically evaluates the likelihood of the realization of deferred tax assets, and adjusts the carrying amount of the deferred tax assets by the valuation allowance to the extent the future realization of the deferred tax assets is not judged to be more likely than not. The Company considers many factors when assessing the likelihood of future realization of its deferred tax assets, including its recent cumulative earnings experience by taxing jurisdiction, expectations of future taxable income or loss, the carryforward periods available to the Company for tax reporting purposes, and other relevant factors.

At December 31, 2010, based on the weight of available evidence, including cumulative losses in recent years and expectations of future taxable income, the Company determined that it was more likely than not that its deferred tax assets would not be realized and have a $47.0 million valuation allowance associated with its deferred tax assets.

The Company adopted the provisions of ASC 740. ASC 740 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. ASC 740 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition.

As a result of the implementation of ASC 740, the Company reduced its net operating loss carryforward by $1,550,000. This reduction of the net operating loss carryforward translated into a reduction of the gross deferred tax asset of $658,500, with a corresponding reduction of the valuation allowance against that deferred tax asset. Due to the offsetting effect of the reduction of the valuation allowance, the adoption of FIN 48 had no impact on the Company's balance sheets or statements of operations.

The following table summarizes the activity related to its unrecognized tax benefits:

|  | Total |
|---|---|
| Balance at January 1, 2010 | $      658,500 |
| Increase related to prior period tax positions | - |
| Increase related to current year tax positions | - |
| Expiration of the statute of limitations for the assessment of taxes | - |
| Other | - |
| Balance at December 31, 2010 | $      658,500 |

The components of income tax expense are as follows:

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| Current federal income tax | $            - | $            - | $            - |
| Current state income tax | - | - | - |
| Deferred taxes | 4,309,420 | 3,520,340 | 15,414,416 |
| Valuation allowance | (4,309,420) | (3,520,340) | (15,414,416) |
|  | $            - | $            - | $            - |

Future changes in the unrecognized tax benefit will have no impact on the effective tax rate due to the existence of the valuation allowance. The Company estimates that the unrecognized tax benefit will not change significantly within the next twelve months. The Company will continue to classify income tax penalties and interest as part of general and administrative expense in its consolidated statements of operations. There were no interest or penalties accrued as of December 31, 2010, 2009 and 2008.

F - 37

The following table summarizes the open tax years for each major jurisdiction:

| Jurisdiction | Open Tax Years |
|---|---|
| Federal | 2003 - 2008 |
| States | 2003 - 2008 |

## 17.    RELATED PARTY TRANSACTIONS

Dr. Shapiro, one of the Company's directors, may be deemed the beneficial owner of the securities owned by The Shapiro Family Trust. Refinanced bridge debt consisted of $70,000 in unsecured convertible notes previously issued and sold to The Shapiro Family Trust on March 21, 2008. The net outstanding amount of principal plus interest of the Notes was converted into the debt within the 2008 debenture on a dollar-for-dollar basis.

Gary Rabin, intereim Chief Executive Officer, Chief Financial Officer and Chairman of the Board of Directors, may be deemed the beneficial owner of the securities owned by PDPI, LLC, in which he holds a partnership interest. Refinanced debt consisted of $60,000 in an unsecured note previously issued and sold to PDPI, LLC, and another $61,000 assumed by PDPI, LLC, and consisted of amounts owed by a third party which were rolled over into the 2008 Debenture.

## 18.    GRANT RECEIVED

On November 2, 2010, the Company received a $977,917 grant under the Patient Protection and Affordable Care Act of 2010 (PPACA). The grant was related to four of the Company's projects: the Blastomere Program, the Myoblast Program, the RPE Program for Stargardt's Disease, and the iPS Program. The grants were for $244,479.25 each, for a total grant of $977,917, and are exempt from federal income taxes. The Company recognized $977,917 as a grant reimbursement in its accompanying consolidated statements of operations during the year ended December 31, 2010.

## 19.    SUBSEQUENT EVENTS

On February 9, 2011, the Company entered into a settlement agreement with Transition Holdings Ltd. ("Transition"), in a dispute over the $3,500,000 received in 2008 and 2009 (see Note 3). The Company and Transition disputed the nature of the consideration provided to the Company. The Company agreed to deliver to Transition 7,413,000 shares of its common stock, issuable in consideration of all monies previously delivered to the Company by Transition in the aggregate amount of $3,500,000. Upon issuance of the shares, all other agreements between the Company and Transition, including licenses, are deemed cancelled, null and void, and of no force or effect. During February 2011, the Company removed the remaining $3,205,856 in deferred license fees by issuing 7,413,000 shares of its common stock.

On February 11, 2011, the Company entered into a settlement agreement with Gemini Master Fund, Ltd. ("Gemini"). The two parties disputed the number of shares of common stock to be issued upon exercise of warrants held by Gemini. In settlement, the Company agreed to deliver Gemini 20,000,000 shares of its common stock, issuable upon cashless exercise of all warrants previously issued by the Company to Gemini. Upon issuance of the shares to Gemini, all other agreements between the Company and Gemini, including any agreements between the Company and any entity controlled by Gemini or their principals, are hereby deemed cancelled, null and void, and of no force or effect. The Company has recognized this warrant exercise during February 2011.

The Company renewed its lease for its Los Angeles office through February 28, 2012. No other terms changed, and monthly rent remains $2,170.

F - 38

20.    SELECTED QUARTERLY DATA (UNAUDITED)

| | Quarterly Periods Ended | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2010 | June 30, 2010 | September 30, 2010 | December 31, 2010 |
| Revenue | $ 205,158 | $ 205,158 | $ 205,158 | $ 109,570 |
| Gross profit | $ 138,508 | $ 138,508 | $ 138,508 | $ 92,920 |
| Loss from operations | $ (14,975,316) | $ (1,124,886) | $ (5,406,563) | $ (10,821,866) |
| Other income (expense) | $ (2,874,317) | $ 4,055,285 | $ 7,342,278 | $ (30,567,947) |
| Net income (loss) | $ (17,849,633) | $ 2,930,399 | $ 1,935,715 | $ (41,389,813) |
| Basic and diluted earnings (loss) per share | $ (0.03) | $ 0.00 | $ 0.00 | $ (0.03) |

| | Quarterly Periods Ended | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2009 | June 30, 2009 | September 30, 2009 | December 31, 2009 |
| Revenue | $ 293,976 | $ 242,995 | $ 248,141 | $ 630,867 |
| Gross profit (loss) | $ 155,224 | $ 165,648 | $ 140,092 | $ 454,116 |
| Loss from operations | $ (5,685,570) | $ (1,733,166) | $ (1,124,287) | $ (2,279,631) |
| Other income (expense) | $ (13,314,306) | $ (27,703,638) | $ (79,987) | $ 15,162,377 |
| Net income (loss) | $ (18,999,876) | $ (29,436,804) | $ (1,204,274) | $ 12,882,746 |
| Basic and diluted earnings (loss) per share | $ (0.04) | $ (0.06) | $ (0.00) | $ 0.02 |

F - 39

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

(a) Evaluation of Disclosure Controls and Procedures.

Our Chief Executive Officer (Principal Executive Officer and Principal Financial Officer) has evaluated our disclosure controls and procedures as of December 31, 2010 and have concluded that these disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms and is accumulated and communicated to our management, including the Chief Executive Officer, as appropriate to allow timely decisions regarding required disclosure.

(b) Management's Report on Internal Control Over Financial Reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f). Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation under the framework in Internal Control – Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2010.

Our internal control over financial reporting as of December 31, 2010, has been audited by SingerLewak LLP, an independent registered public accounting firm, as stated in their report which is included in Item 8 of this report and is incorporated by reference herein.

(c) Changes in Internal Controls Over Financial Reporting.

There were no changes in our internal control over financial reporting that occurred during the fourth quarter of 2010 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders
Advanced Cell Technologies, Inc. and subsidiary

We have audited Advanced Cell Technology, Inc. and subsidiary's internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Advanced Cell Technology, Inc. and subsidiary's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Advanced Cell Technology, Inc. and subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Advanced Cell Technology, Inc. and subsidiary as of December 31, 2010 and 2009 and the related consolidated statements of operations, stockholders' deficit and cash flows for each of the three years in the period ended December 31, 2010, and our report dated March 16, 2011 expressed an unqualified opinion.

SingerLewak LLP

Los Angeles, California
March 16, 2011

### Item 9B. Other Information

None.

### PART III

### Item 10. Directors, Executive Officers and Corporate Governance.

#### DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Our executive officers, key employees and directors are described below. There are no family relationships among our executive officers or directors.

| Name | Age | Position |
| --- | --- | --- |
| Gary Rabin | 45 | Interim Chief Executive Officer and Chairman of the Board of Directors |
| Robert P. Lanza M.D. | 54 | Chief Scientific Officer |
| Alan C. Shapiro, Ph.D. | 65 | Member of the Board of Directors |
| Erkki Ruoslahti, M.D., Ph.D. | 70 | Member of the Board of Directors |

**Gary Rabin** has served as a director since December 2007. Mr. Robin was appointed Interim Chief Executive Officer and Chairman of the Board on December 14, 2010. Mr. Rabin has a twenty year career in finance that primarily encompasses investment management and capital raising targeting small-cap and emerging growth companies. Currently, he is the Managing Partner of GR Advisors LLC, a long/short hedge fund focused on the media and communications industry. Until July 2007, he was a Portfolio Manager at MAC Investment Management, LLC ("MAC"), which he joined in November 2005. MAC is a long/short fundamental equity hedge fund concentrating on growth-oriented stocks including technology, communications and healthcare. Previously, he was a Managing Director and Portfolio Manager at Marketus

Associates, a long/short hedge fund where he focused on communications, healthcare services, energy and special situations. Prior to that, he was Managing Director and Co-Head of the Media and Telecom Investment Banking Group at CIBC World Markets ("CIBC"), where he was responsible for all corporate finance and M&A, financial restructurings, and principal investing activities (both debt and equity) within the sector. Before joining CIBC, Mr. Rabin served in an operating capacity at a broadband services company when he was Chief Strategy Officer of CAIS Internet, Inc. ("CAIS"). At CAIS, he was responsible for raising over $500 million of financing commitments in both the public equity markets and from his relationships at Kohlberg, Kravis Roberts & Co., Qwest Communications, Cisco, Nortel, 3Com and Microsoft. Mr. Rabin has also started and served as Managing Director and Head of the Global Telecom Investment Banking Group at ING Barings Furman Selz, and was a founder of the telecom group at UBS Securities. He began his career in finance in 1987, and concentrated on energy, utilities, and metals until 1993. Throughout his career, Mr. Rabin has been responsible for building and developing businesses. Mr. Rabin earned an AB in Economics from the University of Michigan. Mr. Rabin's long career as a senior manager in both the investment banking community and as a senior financial executive qualifies him to be a member of the Board of Directors of Advance Cell Technology, Inc.

50

**Robert P. Lanza, M.D.** has been our Chief Scientific Officer since October 2007. Dr. Lanza has over 20 years of research and industrial experience in the areas of tissue engineering and transplantation medicine. Before joining us in 1998, from 1990 to 1998, Dr. Lanza was Director of Transplantation Biology at BioHybrid Technologies, Inc., where he oversaw that company's xenotransplantation and bioartificial pancreas programs. He has edited or authored sixteen books, including Principles of Tissue Engineering (2d ed. co-edited with R. Langer and J. Vacante), Yearbook of Cell and Tissue Transplantation, One World The Health & Survival of the Human Species in the Twenty-First Century, and Xeno: The Promise of Transplanting Animal Organs into Humans (co-authored with D.K.C. Cooper). Dr. Lanza received his B.A. and M.D. Degrees from the University of Pennsylvania, where he was both a University Scholar and Benjamin Franklin Scholar. Dr. Lanza is not an officer or director of any other reporting company.

**Alan C. Shapiro, Ph.D.** has served as director since 2005. He adds more than 30 years' experience in corporate and international financial management to the Company. Dr. Shapiro is currently the Ivadelle and Theodore Johnson Professor of Banking and Finance at the Marshall School of Business, University of Southern California, where he previously served as the Chairman of the Department of Finance and Business Economics, Marshall School of Business. Prior to joining the University of Southern California, Dr. Shapiro taught as an Assistant Professor at the University of Pennsylvania, Wharton School of Business, and has been a visiting professor at Yale University, UCLA, the Stockholm School of Economics, University of British Columbia, and the U.S. Naval Academy. Dr. Shapiro has published over 50 articles in such academic and professional journals as the Journal of Finance, Harvard Business Review, and the Journal of Business, among many others. He frequently serves as an expert witness in cases involving valuation, economic damages, international finance, takeovers, and transfer financing through Trident Consulting Group LLC. He received his B.A. in Mathematics from Rice University, and a Ph.D. in Economics from Carnegie Mellon University. Dr. Shapiro is a trustee of Pacific Corporate Group's Private Equity Fund. Dr. Shapiro's board experience on multiple public company boards, his recognized expertise as a highly sought after financial advisor and his career as a professor and Chair in the field of Finance and Administration qualifies him as a valued member of Advanced Cell Technology's Board of Directors.

**Erkki Ruoslahti, M.D., Ph.D.** has served as a director since November 2005. Dr. Ruoslahti joined The Burnham Institute in 1979 and served as its President from 1989 to 2002. Dr. Ruoslahti is the recipient of the 2005 Japan Prize for his work in cell biology. Dr. Ruoslahti's other honors include the Gairdner Prize, and membership in the U.S. National Academy of Sciences, Institute of Medicine, and American Academy of Arts and Sciences. He is a Knight of the Order of the White Rose of Finland. Dr. Ruoslahti earned his M.D. and Ph.D. from the University of Helsinki in Finland. After postdoctoral training at the California Institute of Technology, he held various academic appointments in Finland and at City of Hope National Medical Center in Duarte, California. Dr. Ruoslahti's research has been the basis of several drugs currently on the market or in clinical trials. He has been a founder and director of several biotechnology companies. Dr. Ruoslahti is not an officer or director of any other reporting company. Based upon his scientific background and years as a senior operations manager in the scientific research and development community, Dr. Ruoslahti is uniquely qualified to be a member of Advanced Cell Technology's Board of Directors.

## CORPORATE GOVERNANCE

**General**

We believe that good corporate governance is important to ensure that the Company is managed for the long-term benefit of our stockholders. This section describes key corporate governance practices that we have adopted.

51

**Board of Directors Meetings and Attendance**

The Board of Directors has responsibility for establishing broad corporate policies and reviewing our overall performance rather than day-to-day operations. The primary responsibility of our Board of Directors is to oversee the management of our company and, in doing so, serve the best interests of the company and our stockholders. The Board of Directors selects, evaluates and provides for the succession of executive officers and, subject to stockholder election, directors. It reviews and approves corporate objectives and strategies, and evaluates significant policies and proposed major commitments of corporate resources. Our Board of Directors also participates in decisions that have a potential major economic impact on our company. Management keeps the directors informed of company activity through regular communication, including written reports and presentations at Board of Directors and committee meetings.

We have no formal policy regarding director attendance at the annual meeting of stockholders. The Board of Directors held one meeting in 2010. All board members were present at the meeting.

**Board Committees**

Our Board of Directors has established an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee. The members of each committee are appointed by our Board of Directors, upon recommendation of the Nominating Committee, and serve one-year terms. Each of these committees operates under a charter that has been approved by the Board of Directors. The charter for each committee is available on our website. The Audit Committee met three times during 2010. The Compensation Committee met once during 2010. The Nominating Committee met once during 2010.

*Audit Committee*

The Audit Committee's responsibilities include:

- Monitoring the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance.
- Monitoring the independence and performance of the Company's internal and independent auditors.
- Monitoring compliance by the Company with legal and regulatory requirements.
- Facilitating open communication among the Company's independent auditors, internal auditors, employees, management, and the Board.

Dr. Shapiro, Dr. Ruoslahti and Mr. Rabin serve on our Audit Committee. Dr. Shapiro serves as chair of the Audit Committee. The Board of Directors has determined that Dr. Shapiro is an "audit committee financial expert" as defined in Item 401(e) of Regulation S-B. The Board has determined that Dr. Shapiro meets the additional independence requirements of Rule 10A-3 under the Securities Exchange Act of 1934.

*Compensation Committee*

The Compensation Committee's responsibilities include:

- Reviewing and recommending approval of the compensation of our executive officers,
- Overseeing the evaluation of our senior executives,
- Reviewing and making recommendations to the Board of Directors regarding incentive compensation and equity-based plans,
- Administering our stock incentive plans, and
- Reviewing and making recommendations to the Board of Directors regarding director compensation.

The members of the Compensation Committee are Dr. Shapiro, Dr. Ruoslahti and Mr. Rabin.

52

*Nominating Committee*

The Nominating Committee's responsibilities include:

- Identifying individuals qualified to become board members;
- Recommending to the Board the persons to be nominated for election as directors and to each of the board's committees;
- Reviewing and making recommendations to the Board with respect to senior management succession planning; and
- Overseeing an annual evaluation of the Board.

The members of the Nominating Committee are Dr. Shapiro, Dr. Ruoslahti and Mr. Rabin.

**Changes in Nominating Procedures**

None.

**Director Candidates**

The process followed by the Nominating Committee to identify and evaluate director candidates includes requests to board members and others for recommendations, meetings from time to time to evaluate biographical information and background material relating to potential candidates and interviews of selected candidates by members of the Nominating Committee and the Board.

In considering whether to recommend any particular candidate for inclusion in the Board's slate of recommended director nominees, the Nominating Committee applies certain criteria, including

- The candidate's honesty, integrity and commitment to high ethical standards,

- Demonstrated financial and business expertise and experience,

- Understanding of our company, its business and its industry,

- Actual or potential conflicts of interest, and

- The ability to act in the interests of all stockholders.

The Nominating Committee does not assign specific weights to particular criteria and no particular criterion is a prerequisite for each prospective nominee. We believe that the backgrounds and qualifications of our directors, considered as a group, should provide a significant breadth of experience, knowledge and abilities that will allow our Board to fulfill its responsibilities.

The Nominating Committee will consider director candidates recommended by stockholders or groups of stockholders who have owned more than 5% of our common stock for at least a year as of the date the recommendation is made. Stockholders may recommend individuals to the Nominating Committee for consideration as potential director candidates by submitting their names, together with appropriate biographical information and background materials and a statement as to whether the stockholder or group of stockholders making the recommendation has beneficially owned more than 5% of our common stock for at least a year as of the date such recommendation is made, to the Nominating Committee, c/o Corporate Secretary, Advanced Cell Technology, Inc., 381 Plantation Street, Worcester, Massachusetts. Assuming that appropriate biographical and background material have been provided on a timely basis, the Committee will evaluate stockholder-recommended candidates by following substantially the same process, and applying substantially the same criteria, as it follows for candidates submitted by others.

**Communicating with the Directors**

The Board will give appropriate attention to written communications that are submitted by stockholders, and will respond if and as appropriate. The chair of the Audit Committee is primarily responsible for monitoring communications from stockholders and for providing copies or summaries to the other directors as he considers appropriate.

53

Communications are forwarded to all directors if they relate to important substantive matters and include suggestions or comments that the chair of the Audit Committee considers to be important for the directors to know. In general, communications relating to corporate governance and corporate strategy are more likely to be forwarded than communications relating to ordinary business affairs, personal grievances and matters as to which we tend to receive repetitive or duplicative communications.

Stockholders who wish to send communications on any topic to the Board should address such communications to the Board of Directors, c/o Corporate Secretary, Advanced Cell Technology, Inc., 33 Locke Drive, Marlborough, Massachusetts, 01752. You should indicate on your correspondence that you are an Advanced Cell Technology, Inc. stockholder.

Anyone may express concerns regarding questionable accounting or auditing matters or complaints regarding accounting, internal accounting controls or auditing matters to the Audit Committee by calling (508) 756-1212. Messages to the Audit Committee will be received by the chair of the Audit Committee and our Corporate Secretary. You may report your concern anonymously or confidentially.

**Board Leadership Structure and Role in Risk Oversight**

Although we have not adopted a formal policy on whether the Chairman and Chief Executive Officer positions should be separate or combined, we have traditionally determined that it is in the best interests of the Company and its shareholders to combine these roles. Mr. Caldwell served as our Chairman from January 2005 until December 13, 2010. From December 14, 2010 and currently, Gary Rabin serves as our Interim Chairman and Chief Executive Officer. Due to the small size and early stage of the Company, we believe it is currently most effective to have the Chairman and Chief Executive Officer positions combined.

Our Audit Committee is primarily responsible for overseeing our risk management processes on behalf of our board of directors. The Audit Committee receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding our company's assessment of risks. In addition, the Audit Committee reports regularly to the full Board of Directors, which also considers our risk profile. The Audit Committee and the full Board of Directors focus on the most significant risks facing our company and our company's general risk management strategy, and also ensure that risks undertaken by our Company are consistent with the Board's appetite for risk. While the Board oversees our company's risk management, management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing our company and that our Board leadership structure supports this approach.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers and persons who own more than 10% of the Company's stock (collectively, "Reporting Persons") to file with the SEC initial reports of ownership and changes in ownership of the Company's common stock. Reporting Persons are required by SEC regulations to furnish the Company with copies of all Section 16(a) reports they file. To the Company's knowledge, based solely on its review of the copies of such reports received or written representations from certain Reporting Persons that no other reports were required, the Company believes that during its fiscal year ended December 31, 2010, all Reporting Persons timely complied with all applicable filing requirements, except that Form 4s were not timely filed for the Company's officers and directors and have since been filed.

**Code of Ethics**

We have adopted a code of business conduct and ethics that applies to our directors, officers (including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions) as well as our employees. A copy of our code of business conduct and ethics is available on our website at *www.advancedcell.com* under "Investors—Corporate Governance." We intend to post on our website all disclosures that are required by applicable law, the rules of the Securities and Exchange Commission or OTCBB listing standards concerning any amendment to, or waiver from, our code of business conduct and ethics.

54

ITEM 11. *EXECUTIVE COMPENSATION*

COMPENSATION DISCUSSION AND ANALYSIS

This section describes the compensation program for our executive officers. In particular, this section focuses on our 2010 compensation program and related decisions.

The Board of Directors has established a Compensation Committee, the majority of which are independent outside directors which approves all compensation and awards to executive management. The members of the Compensation Committee have extensive executive level experience in other companies and bring a perspective of reasonableness to compensation matters with our Company. In addition, the Compensation Committee compares executive compensation practices of similar companies at similar stages of development.

The objectives of our compensation program are as follows:

- Reward performance that drives substantial increases in shareholder value, as evidenced through both future operating profits and increased market price of our common shares; and
- Attract, hire and retain well-qualified executives.

The compensation level of our executives generally reflects their unique position and incentive to positively affect our future operating performance and shareholder value. Part of the compensation of our executives is from equity compensation, primarily through stock option grants or restricted stock awards.

Specific salary and bonus levels, as well as the amount and timing of equity incentive grants, are determined informally and judgmentally, on an individual-case basis, taking into consideration each executive's unique talents and experience as they relate to our needs. With respect to equity compensation, the Compensation Committee approves all option grants, generally based on the recommendation of the president and chief executive officer. Executive compensation is paid or granted pursuant to each executive's compensation agreement. Compensation adjustments are made occasionally based on changes in an executive's level of responsibility or on changed local and specific executive employment market conditions.   Based on these factors the Compensation Committee approved the execution of employment agreement with the Company's only two executive officers.

With respect to the cash bonus awarded to Mr. Caldwell in 2010, $100,000 was awarded. The Board approved the award of $100,000 as a bonus because this was the amount that the Board thought was fair in light of Mr. Caldwell's recent contributions to the Company and one that he would also find acceptable. With respect to the cash bonus awarded to Mr. Rabin, $40,000 was awarded as a signing bonus in connection with the execution of the Employment Agreement between the Company and Mr. Rabin, dated December 14, 2010. The Board approved the award because the board thought that this bonus award coupled with the other compensation provided for in Mr. Rabin's employment agreement would create a compensation package that Mr. Rabin would find acceptable.

With respect to the 5,000,000 stock options and 5,000,000 shares of the Company's common stock awarded to Mr. Rabin, the exercise price was the price of the Company's common stock on the day that Board approved the grant of the options.  With respect to the amount of the stock and options the Board approved the grant because it believed that this was fair in light of the contributions of Mr. Rabin, and the Board believed the shares would provide sufficient incentive for Mr. Rabin to perform services as Interim Chairman and Chief Executive Officer.

With respect to the cash bonus awarded to Dr. Lanza in 2010, $146,875 was awarded.  The Board approved the award of $100,000 as a bonus because this was the amount that the Board thought was fair in light of Mr. Lanza's recent contributions to the Company and one that he would also find acceptable. The balance of the bonus awarded to Dr. Lanza was awarded to him as part of the bonuses awarded to all employees that participated in the filing of the IND application multiplied by 1.5, which equaled $46,875.

55

*Risk Management Considerations*

In response to the ongoing global economic recession, in 2010 the compensation committee considered the incentives under our executive compensation program and whether they introduced or encouraged excessive risk taking or other behaviors by our executives that could have a negative impact on our business. The compensation committee determined that our executive compensation program provides an appropriate balance of incentives and that it does not encourage our executives to take excessive risks or otherwise create risks that are reasonably likely to have a material adverse effect on us.

**Summary Compensation Table**

The following table summarizes the annual compensation paid to our named executive officers for the three years ended December 31, 2010, 2009 and 2008:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Comp ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| William M. Caldwell, IV Chief Executive Officer, Principle Financial Officer, and Chairman of the Board of Directors | 2010 | 586,667 | 240,000 | 8,035,254 | - | - | 8,861,921 |
| | 2009 | 417,500 | 140,000 | - | 210,866 | 1,879(1) | 770,245 |
| | 2008 | 350,000 | - | - | - | 995(1) | 350,995 |
| Gary Rabin Interim Chief Executive Officer | 2010 | 18,461 | 40,000 | - | 686,896 | 115,692(3) | 861,049 |
| Robert P. Lanza, M.D., Chief Scientific Officer | 2010 | 375,000 | 50,000 | 2,717,298 | - | - | 3,142,298 |
| | 2009 | 311,250 | 81,250 | - | 441,665 | 1,524(1) | 835,689 |
| | 2008 | 290,000 | 35,000 | - | 168,237 | 636(1) | 493,873 |
| Jonathan F. Atzen Sr. Vice President, General Counsel and Secretary (2) | 2008 | 78,077 | - | 93,669 | 1,598 | 3,001(2) | 176,345 |

Please see the assumptions relating to the valuation of our stock option awards which are contained in Notes to audited Financial Statements included in this 10K.

(1) This amount represents a life insurance premium paid by the Company for the named executive officer.

(2) Effective as of March 7, 2008, Mr. Atzen resigned from his positions at the Company and terminated his employment arrangement with the Company. This amount in 2008 represents $2,670 in payments made to Mr. Atzen as part of his $1,000 monthly car allowance through his termination date and $331 in life insurance premiums paid by the Company for Mr. Atzen. This amount in 2007 represents $12,000 in payments made to Mr. Atzen as part of his $1,000 monthly car allowance and $360 in life insurance premiums paid by the Company for Mr. Atzen.

(3) This amount represents the amount earned by Mr. Rabin in his capacity as a director for the Company until December 14, 2010.

56

**Employment Agreements**

*Employment Agreement with William M. Caldwell, IV* On February 22, 2010, the Company entered into an employment agreement with William M. Caldwell, IV, who was the Company's chief executive officer and chairman from January 2005 to December 13, 2010. Pursuant to the Employment Agreement, the parties agreed as follows:

- Mr. Caldwell would serve as the Company's chief executive officer, for a term of two and 1/3 years commencing on October 1, 2009, subject to earlier termination as provided therein. The term under the Employment Agreement would renew automatically for additional one year terms unless either party would provide written notice of intent not to renew the employment agreement at least 90 days prior to such automatic renewal.

- The Company agreed to pay Mr. Caldwell an initial base salary of $480,000 per annum, which base salary would increase annually by not less than the annual increase in the consumer price index, and could be increased during the term by a greater amount at the sole discretion of the Company's board of directors.

- Within 10 days of execution of the employment agreement, Mr. Caldwell received a retention bonus of $100,000.

- Commencing in the 2010 calendar year, the Company agreed to pay Mr. Caldwell an annual bonus based on the performance of the Company's common stock. The Company could also pay Mr. Caldwell additional bonuses in the Company's sole discretion.

- The Company issued to Mr. Caldwell restricted common stock in the amount of 89,280,595.

- If Mr. Caldwell's employment under the Employment Agreement were to be terminated by the Company without cause, or by Mr. Caldwell for good reason, the Company would pay Mr. Caldwell severance of two years' base salary.

*Employment Agreement with Gary Rabin*

Effective December 14, 2010, the Company entered into an employment agreement with Gary Rabin, Chief Executive Officer, Chief Financial Officer, and Chairman of the Board. Pursuant to the Employment Agreement, the parties agreed as follows:

- Mr. Rabin's employment is on at "at will" basis. The Company shall pay Executive an annual salary at the rate of four hundred eighty thousand ($480,000) per year.
- Within ten (10) days following the execution of the Agreement, but not prior to January 3, 2011, Mr. Rabin received signing bonus of $40,000.
- The Company shall pay Mr. Rabin a performance bonus. The target amount of the performance bonus shall be $480,000 (i.e., 100% of Base Salary) per year. However, the performance bonus shall be no less than $144,000 (i.e., 30% of Base Salary) per year and no more than $720,000 (i.e., 150% of Base Salary) per year. The actual amount of the performance bonus shall be determined by the Compensation Committee of the Board during each calendar year quarter based on the performance of the Company and Mr. Rabin, with reference to the performance goals and/or metrics established by the Compensation Committee in consultation with Mr. Rabin with respect to such performance bonus period.
- On January 3, 2011, the Company granted Mr. Rabin Five Million (5,000,000) shares of restricted common stock of the Company.
- On December 29, 2010, the Company issued Mr. Rabin a non-qualified option to purchase Five Million (5,000,000) shares of common stock of the Company with an exercise price of $0.14.
- If Mr. Rabin's employment under the Employment Agreement were to be terminated by the Company without cause, the Company will pay Mr. Rabin severance of one year's base salary and any unpaid performance bonus pro-rated to the termination date.

*Employment Agreement with Robert P. Lanza, M.D.*    On October 1, 2009, the Company entered into an employment agreement (the "Agreement") with Robert P. Lanza, the Company's chief scientific officer since October 2007. Pursuant to the Agreement, the parties agreed as follows:

- Robert P. Lanza will continue to serve as the Company's chief scientific officer, for a term of two years commencing on October 1, 2009, subject to earlier termination as provided therein. The term under the Agreement may be extended by mutual written agreement.

- The Company will pay Mr. Lanza a base salary of $375,000 per annum, which may be increased during the term at the sole discretion of the Company's board of directors. The Company may also pay Mr. Lanza annual bonuses in the Company's sole discretion.

- The Company will issue to Mr. Lanza 30,270,203 shares of free trading common stock from the Company's 2005 Employee Incentive Plan.

- If Mr. Lanza's employment under the Agreement is terminated by the Company without cause, the Company will pay Mr. Lanza severance of one year's base salary.

**Stock Option Grants Under Our Stock Option Plans**

During 2010, there were no stock option awards granted to our executive officers under our stock option plans.

**Outstanding Equity Awards at Fiscal Year-End**

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date ($) |
|---|---|---|---|---|
| William M. Caldwell, IV | 651,161(1) | - | 0.25 | 12/31/2014 |
| Chief Executive Officer and | 1,903,112(1) | - | 0.85 | 1/31/2015 |
| Chairman of the Board of Directors | 2,554,273(2) | - | 0.098 | 11/13/2019 |
| Gary Rabin Interim Chief Executive Officer and Chairman | - | 5,000,000(7) | 0.140 | 12/29/2020 |
| Robert P. Lanza, M.D., | 750,000(3) | - | 0.05 | 8/12/2014 |
| Chief Scientific Officer | 500,000(4) | - | 0.85 | 1/31/2015 |
| | 250,000(3) | - | 2.20 | 9/15/2015 |
| | 2,916,667(5) | 1,083,333 | 0.21 | 2/17/2018 |
| | 5,350,000(6) | - | 0.098 | 11/13/2019 |

(1)  These options held by Mr. Caldwell vested in full as of December 31, 2008.

(2)  These options held by Mr. Caldwell vest as follows: 50% of the shares vest immediately with the remaining vesting at 1/12 per month.

(3)  These options held by Dr. Lanza vested in full as of December 31, 2006.

(4)  These options held by Dr. Lanza vested in full as of January 31, 2009.

(5)  These options held by Dr. Lanza vest in equal monthly installments over 48 months.

(6)  These options held by Dr. Lanza vest as follows: 50% of the shares vest immediately with the remaining vesting at 1/12 per month.

(7)  These options held by Mr. Rabin vest at the earlier (i) January 1, 2012, or (ii) the new CEO start date.

58

**Option Exercises and Stock Vested**

There were no exercises of stock options for the named executive officers in the year ended December 31, 2010. During 2010, Mr. Caldwell was issued 85,325,595 shares of restricted stock with a one year restriction. During 2010, Mr. Lanza was issued 20,000,000 shares of stock which vested immediately.

**Pension Benefits**

We do not have any plan which provides for payments or other benefits at, following, or in connection with retirement.

**Non-qualified Deferred Compensation**

We do not have any defined contribution or other plan which provides for the deferral of compensation on a basis that is not tax-qualified.

## DIRECTOR COMPENSATION

| Name and Principal Position | Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | All Other Comp ($) | Total ($) |
|---|---|---|---|---|---|---|
| Alan C. Shapiro, Ph.D. | 2010 | 33,375 | - | - | - | 33,375 |
| Erkki Ruoslahti, M.D., Ph.D. | 2010 | 56,583 | - | - | - | 56,583 |

**Director Compensation Arrangements**

Non-executive members of the Company's Board of Directors receive (1) an initial grant of 100,000 shares of common stock, (2) an annual grant of 100,000 shares of common stock (this number has been increased to 200,000 for 2008), (3) an annual retainer of $40,000 (payable quarterly) and (4) a cash payment for attendance at each board meeting in the amount of $1,500 for in-person meetings and $1,000 for telephonic meetings. Regarding members of the Company's Audit Committee, the Chair receives a payment of $1,500 per meeting and the regular members receive $1,000 per meeting. With respect to the Company's Compensation Committee and the Company's Nominating and Corporate Governance Committee, the Chair receives a payment of $1,125 per meeting and the regular members receive $750 per meeting. Each director is entitled to receive payment of the directors' fees in the form of shares of the Company's Common Stock valued at 150% of the actual directors' fees due and payable. The fee structure for the directors was established and approved by the Compensation Committee and ratified by the full Board of Directors.

59

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

**Beneficial Ownership of Directors, Officers and 5% Stockholders**

The following table sets forth certain information regarding the beneficial ownership of our Common Stock as of March 11, 2011. On such date, 1,506,715,382 shares of Common Stock were outstanding. Beneficial ownership is determined in accordance with the applicable rules of the Securities and Exchange Commission and includes voting or investment power with respect to shares of our Common Stock. The information set forth below is not necessarily indicative of beneficial ownership for any other purpose, and the inclusion of any shares deemed beneficially owned in this table does not constitute an admission of beneficial ownership of those shares. Unless otherwise indicated, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except, where applicable, to the extent authority is shared by spouses under applicable state community property laws.

The following table sets forth information regarding beneficial ownership of our capital stock as of March 11, 2011 by:

- Each person, or group of affiliated persons, known to us to be the beneficial owner of more than 5% of the outstanding shares of our Common Stock,

- Each of our directors and named executive officers, and

- All of our directors and executive officers as a group.

| Name and Address [1] of Beneficial Owner | Number of Shares Beneficially Owned | Percentage |
|---|---|---|
| **5% or Greater Stockholders** | | |
| None | | |
| | | |
| **Directors and Named Executive Officers** | | |
| William M. Caldwell, IV** | 95,415,414(1) | 6.31% |
| Robert P. Lanza, M.D. | 34,569,982(2) | 2.75% |
| Alan C. Shapiro | 19,129,775(3) | 1.32% |
| Erkki Ruoslahti | 2,744,119 | * |
| Gary Rabin | 7,037,430(4) | * |
| Directors and Executive Officers as a Group ( 5 Persons) | 158,896,720 | 10.38% |

* Less than 1%
** Mr. Caldwell passed away on December 13, 2010

(1)     Includes 5,108,546 shares subject to stock options that are currently exercisable or exercisable within 60 days of February 7, 2011 that are held directly by Mr. Caldwell. Also includes 1,026,000 shares issuable upon exercise of certain warrants held by Andwell, LLC, which are 100% owned by Mr Caldwell.

(2)     Includes 9,616,667 shares subject to stock options that are currently exercisable or exercisable within 60 days of February 7, 2011.

(3)     Includes (i) 16,011,435 shares subject to convertible debentures, board fees, common stock grant held by The Shapiro Family Trust and of which Dr. Shapiro may be deemed the beneficial owner, (ii) 3,018,340 shares subject to warrants in connection with the 2005-2008 convertible debentures, and (iii) 100,000 shares subject to stock options that are currently exercisable or exercisable within 60 days of February 7, 2011

(4)     Includes indirect ownership of 1,239,501 shares issued to PDPI, LLC on December 22, 2010, upon exercise of certain warrants, which such number of shares represents Mr. Rabin's proportional interest in the total number of shares held by PDPI, LLC, based on his 33.33% equity interest in the entity. Mr. Rabin disclaims beneficial ownership in the shares held by PDPI, LLC.

60

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

None of the following parties has, during the year ended December 31, 2010, had any material interest, direct or indirect, in any transaction with us or in any presently proposed transaction that has or will materially affect us, other than as noted in this section:

- Any of our directors or officers,

- Any person proposed as a nominee for election as a director,

- Any person who beneficially owns, directly or indirectly, shares carrying more than 5% of the voting rights attached to our outstanding shares of common stock,

- Any of our promoters, and

- Any relative or spouse of any of the foregoing persons who has the same house as such person.

All references to share numbers in this section are on a pre-reverse split basis.

**Board Determination of Independence**

The Company complies with the standards of "independence" prescribed by rules set forth by the National Association of Securities Dealers ("NASD"). Accordingly, a director will only qualify as an "independent director" if, in the opinion of our Board of Directors, that person does not have a material relationship with our company which would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. A director who is, or at any time during the past three years, was employed by the Company or by any parent or subsidiary of the Company, shall not be considered independent. Accordingly, Dr. Alan Shapiro and Dr. Erkki Ruoslahti meet the definition of "independent director" under Rule 4200(A)(15) of the NASD Manual; Mr. Rabin does not.

**Item 14. Principal Accounting Fees and Services**

The following table summarizes the fees of our current independent registered public accounting firm, SingerLewak LLP, billed to us for each of the last two fiscal years for audit services and billed to us in each of the last two years for other services:

| Fee Category | 2010 | 2009 | 2008 |
|---|---|---|---|
| Audit Fees | $  215,000 | $  213,859 | $  212,838 |
| Audit Related Fees | $  33,102 | $  12,000 | $  46,222 |
| Tax Fees | $  - | $  - | $  - |
| All Other Fees | $  - | $  - | $  - |

Audit fees consist of aggregate fees billed for professional services rendered for the audit of the Company's annual financial statements and review of the interim financial statements included in quarterly reports or services that are normally provided by the independent auditor in connection with statutory and regulatory filings or engagements for the fiscal years ended December 31, 2010, 2009 and 2008.

Audit related fees consist of aggregate fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements and are not reported under "Audit Fees." These fees include review of registration statements and participation at meetings of the audit committee.

61

Tax fees consist of aggregate fees billed for professional services for tax compliance, tax advice and tax planning.

All other fees consist of aggregate fees billed for products and services provided by the independent auditor, other than those disclosed above. These fees include services related to certain accounting research and assistance with a regulatory matter.

The Company's policy is to pre-approve all audit and permissible non-audit services provided by the independent auditors. These services may include audit services, audit-related services, tax services and other services. Pre-approval is generally provided for up to one year and any pre-approval is detailed as to the particular service or category of services and is generally subject to a specific budget. The independent auditors and management are required to periodically report to the audit committee regarding the extent of services provided by the independent auditors in accordance with this pre-approval, and the fees for the services performed to date. To the extent that additional services are necessary beyond those specifically budgeted for, the audit committee and management pre-approve such services on a case-by-case basis. All services provided by the independent auditors were approved by the Audit Committee.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

**(a)(1) Financial Statements**

The following is a list of the Financial Statements included in Item 8 of Part II of this Report.

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Balance Sheets as of December 31, 2010 and December 31, 2009 | F-2 |
| Statements of Operations for the Years Ended December 31, 2010, 2009 and 2008 | F-3 |
| Statements of Stockholders' Equity for the Years Ended December 31, 2010, 2009 and 2008 | F-4 |
| Statements of Cash Flows for the Years Ended December 31, 2010, 2009 and 2008 | F-5 |
| Notes to Financial Statements | F-6 |

**(a)(2) Financial Statement Schedules**

Schedules not included herein are omitted because they are inapplicable or not required or because the required information is given in the financial statements and notes thereto.

62

(b)

The exhibits required by this item and included in this report or incorporated herein by reference are as follows:

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger between the Compny, A.C.T. Acquisition Corp. and ACT, dated as of January 3, 2005 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 4, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 2.2 | Agreement and Plan of Merger between Advanced Cell Technology, Inc., a Nevada corporation, and Advanced Cell Technology, Inc., a Delaware corporation, dated as of November 18, 2005 (previously filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on November 21, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 2.2 | Agreement and Plan of Merger between Advanced Cell Technology, Inc., a Delaware corporation, and ACT, dated as of November 18, 2005 (previously filed as Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed on November 21, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.1 | Certificate of Incorporation of the Company (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on November 21, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.1.1 | Certificate of Amendment to Articles of Incorporation dated April 1, 2004 (previously filed as Exhibit 3.1.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.1.2 | Certificate of Amendment to Articles of Incorporation dated December 30, 2004 (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on January 4, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.1.3 | Certificate of Amendment to Articles of Incorporation dated June 23, 2005 (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on June 22, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.1.4 | Certificate of Amendment to Articles of Incorporation dated July 6, 2005 (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on July 7, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.15 | Certificate of Amendment to Certificate of Incorporation dated September 15, 2009 (previously filed) |
| 3.16 | Certificate of Designation of Series B Preferred Stock 2005 (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on November 12, 2009 (File No. 000-50295) and incorporated by reference herein). |
| 3.17 | Certificate of Designation of Series C Preferred Stock (previously filed as exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on January 3, 2011 and incorporated herein by reference). |
| 3.2 | Bylaws of the Company (previously filed as Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed on November 21, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 3.2.1 | Amendment to Bylaws of the Company (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on December 29, 2004 (File No. 000-50295) and incorporated by reference herein). |
| 4.1 | Specimen Stock Certificate (previously filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed on November 21, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.2 | Form of $0.05 Warrant to Purchase Common Stock of ACT. ACT issued warrants in this form for the purchase of an aggregate of 900,000 shares, including a warrant to purchase 250,000 shares of ACT common stock to Andwell, LLC, an entity affiliated with William Caldwell, IV, the Chief Executive Officer and a director of the Company (previously filed as Exhibit 4.2 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.3 | Form of $0.25 Warrant to Purchase Common Stock of ACT. ACT issued warrants in this form for the purchase of an aggregate of 1,954,000 shares, including (i) a warrant to purchase 236,000 shares of ACT common stock to Andwell, LLC, an entity affiliated with William Caldwell, IV, the Chief Executive Officer and a director of the Company, (ii) a warrant to purchase 75,000 shares of ACT common stock to Rocket Ventures, an entity affiliated with Jonathan Atzen, a Senior Vice President and the General Counsel of the Company (previously filed as Exhibit 4.3 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.4 | $0.25 Warrant to Purchase Common Stock of the Company issued to Gunnar Engstrom (previously filed as Exhibit 4.4 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.5 | Form of $0.85 Warrant to Purchase Common Stock of ACT (previously filed as Exhibit 4.5 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.6 | Form of $1.27 Warrant to Purchase Common Stock of ACT (previously filed as Exhibit 4.6 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 4.7 | Form of $2.00 Warrant to Purchase Common Stock of ACT (previously filed as Exhibit 4.7 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |

4.8     Form of Subscription Agreement to Purchase Series A Convertible Preferred Units of ACT (previously filed as Exhibit 4.8 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

4.9     Form of Share Purchase Agreement to purchase common stock of Two Moons Kachinas Corp. ("TMOO"), the predecessor to the Company (previously filed as Exhibit 4.9 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

4.10    Form of Lock-Up Agreement entered into by certain sellers of TMOO common stock (previously filed as Exhibit 4.10 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

4.11    Form of Lock-Up Agreement entered into by certain buyers of TMOO common stock (previously filed as Exhibit 4.11 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

4.12    Investor's Rights Agreement between ACT and Avian Farms, Inc. dated December 31, 1998 (previously filed as Exhibit 4.12 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

9.1     Form of Voting Agreement for shares of common stock of ACT held by certain parties effective as of January 31, 2005 (previously filed as Exhibit 9.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

| | |
|---|---|
| 10.1 | Exclusive Development and License Agreement between GTC Biotherapeutics (f/k/a as Genzyme Transgenics Corporation) and ACT dated June 8, 1999 (previously filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000- 50295) and incorporated by reference herein). |
| 10.2 | Exclusive License Agreement dated April 16, 1996 between the University of Massachusetts and ACT as amended on September 1, 1997, May 31, 2000 and September 19, 2002 (previously filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.3 | Materials and Research Data License Agreement dated January 26, 2001 between Wake Forest University and ACT (previously filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.3.1 | July 1, 2002 Assignment to Wake Forest University Health Sciences (previously filed as Exhibit 10.3.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.4 | Exclusive License Agreement dated February 1, 2002 between the University of Massachusetts and ACT (previously filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.5 | Non-Exclusive Sublicense Agreement between ACT and Infigen, Inc. dated August 1, 2003 (previously filed as Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.6 | Non-Exclusive License Agreements, dated January 1, 2001 between ACT and PPL Therapeutics (Scotland) Limited (previously filed as Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.7 | Nonexclusive License Agreement dated May 1, 2001 between ACT and Immerge BioTherapeutics, Inc. (previously filed as Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.8 | Nonexclusive License and Sponsored Research Agreement dated June 29, 2001 between ACT and Charles River Laboratories, Inc. (previously filed as Exhibit 10.8 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.9 | Non-Exclusive Sublicense Agreement between Cyagra, Inc., ACT, ACT Group and Goyaike, S.A. dated November 20, 2001 (previously filed as Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.10 | Exclusive Sublicense Agreement between ACT, ACT Group and Cyagra, Inc. dated June 28, 2002 (previously filed as Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.11 | Non-Exclusive License Agreement dated November 8, 2002 between ACT and Merial Limited (previously filed as Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.12 | Non-Exclusive Sublicense Agreement between ACT and Infigen, Inc. dated August 1, 2003 (previously filed as Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.13 | Exclusive License Agreement dated October 22, 2003 between ACT and Exeter Life Sciences, Inc. (previously filed as Exhibit 10.13 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.13.1 | Letter of Intent between ELS and ACT dated March 16, 2003 (previously filed as Exhibit 10.13.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.13.2 | Sponsored Research Agreement (previously filed as Exhibit 10.13.2 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.14 | Non-Exclusive License Agreement dated January 4, 2002 between ACT and Genetic Savings & Clone (previously filed as Exhibit 10.14 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.15 | Non-Exclusive License Agreement dated February 3, 2004 between ACT and Pureline Genetics (previously filed as Exhibit 10.15 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.16 | Non-Exclusive License Agreement dated February 3, 2004 between ACT and First Degree Genetics (previously filed as Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.17 | Non-Exclusive License Agreement dated February 3, 2004 between ACT and One Degree Genetics (previously filed as |

|       | Exhibit 10.17 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
|-------|------------------------------------------------------------------------------------------------------------------------------------------------------|
| 10.18 | Option to License Intellectual Property dated December 31, 2003 between ACT and PacGen Cellco, LLC (previously filed as Exhibit 10.18 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.18.1 | First Amendment to Option to License Intellectual Property dated February 13, 2004 (previously filed as Exhibit 10.18.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.19 | Exclusive License Agreement (Infigen IP) dated May 14, 2004 between ACT and PacGen Cellco, LLC (previously filed as Exhibit 10.19 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.19.1 | First Amendment to Exclusive License Agreement (Infigen IP) dated August 25, 2005. |
| 10.20 | Exclusive License Agreement (UMass IP) dated May 14, 2004 between ACT and PacGen Cellco, LLC (previously filed as Exhibit 10.20 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.20.1 | First Amendment to Exclusive License Agreement (UMass IP) dated August 25, 2005, previously filed and incorporated by reference herein. |
| 10.21 | Exclusive License Agreement (ACT IP) dated May 14, 2004 between ACT and PacGen Cellco, LLC (previously filed as Exhibit 10.21 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.21.1 | First Amendment to Exclusive License Agreement (ACT IP) dated August 25, 2005, previously filed and incorporated by reference herein. |
| 10.22 | Agreement to Amend ACT/CELLCO License Agreements dated September 7, 2004 ACT and PacGen Cellco, LLC (previously filed as Exhibit 10.22 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.23 | Indemnification Agreement of David Merrell to certain buyers of TMOO common stock dated December 31, 2004 (previously filed as Exhibit 10.23 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.24 | Convertible Promissory Note to ACT Group, Inc. dated July 12, 2002 in the amount of $1,000,000 (previously filed as Exhibit 10.24 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.25 | Promissory Note issued by ACT to Pierce Atwood LLP dated January 2005 in the amount of $150,000 (previously filed as Exhibit 10.25 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.26 | Promissory Note issued by ACT to Pierce Atwood dated July 1, 2003 in the amount of $339,000 (previously filed as Exhibit 10.26 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |

64

10.27    Promissory Note issued by ACT to Rothwell, Figg, Ernst & Manbeck, P.C. dated July 8, 2003 in the amount of $272,108 (previously filed as Exhibit 10.27 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.28    Forbearance and Stock Purchase Agreement Among Avian Farms, Inc., ACT Group, Inc., ACT and Cima Biotechnology, Inc., dated July 16, 1999, as amended December 23, 1999 (previously filed as Exhibit 10.28 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.29    Securityholders' Agreement among ACT, ACT Group, Cyagra, Inc. and Goyaike S.A. dated November 20, 2001 (previously filed as Exhibit 10.29 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.30.1    Securityholders' Agreement among ACT, ACT Group, Cyagra, Inc. and Goyaike S.A. dated July 1, 2002 (previously filed as Exhibit 10.30.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.30.2    Collaboration Agreement and Technology License (previously filed as Exhibit 10.30.2 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.30.3    Separation Agreement among ACT, ACT Group, Cyagra, Inc. and Goyaike S.A. (previously filed as Exhibit 10.30.3 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.31    Membership Interest Exchange and Asset Sale Agreement dated May 31, 2000, by and among ACT and Hematech, LLC, et al. (previously filed as Exhibit 10.31 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.31.1    Buyout Option Agreement dated May 31, 2000 between Hematech, LLC and ACT (previously filed as Exhibit 10.31.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.32    Space Sublease Agreement dated November, 2004, between BioReliance and ACT, for 381 Plantation Street, Worcester, MA 01605 (previously filed as Exhibit 10.32 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.33    Advanced Cell Technology, Inc. 2004 Stock Option Plan. Pursuant to this option plan, ACT issued options to purchase an aggregate 2,604,000 shares, including (i) options to purchase 1,500,000 shares of ACT common stock to Michael West, the Chairman of the Board of Directors and the Chief Scientific Officer of the Company, and (ii) options to purchase 750,000 shares of ACT common stock to Robert Lanza, the Vice President of Medical and Scientific Development of the Company (previously filed as Exhibit 10.33 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000- 50295) and incorporated by reference herein).

10.34    Advanced Cell Technology, Inc. 2004 Stock Option Plan II. Pursuant to this option plan, ACT issued options to purchase an aggregate 1,301,161 shares, including (i) options to purchase 651,161 shares of ACT common stock to William Caldwell, IV, the Chief Executive Officer and a director of the Company, and (ii) options to purchase 240,000 shares of ACT common stock to Robert Peabody, a director of the Company (previously filed as Exhibit 10.34 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.35    A.C.T. Holdings, Inc. 2005 Stock Option Plan (previously filed as Appendix A to the Registrant's preliminary proxy statement on Form PRE-14A filed on May 10, 2005 (File No. 000-50295) and incorporated by reference herein).

10.36    Form of Incentive Stock Option Agreement (previously filed as Exhibit 10.36 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.37    Form of Nonqualified Stock Option Agreement (previously filed as Exhibit 10.37 to the Registrant's Quarterly Report on Form 10- QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.38    Employment Agreement between ACT and William M. Caldwell, IV dated December 31, 2004 (previously filed as Exhibit 10.38 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.39    Employment Agreement between ACT and Michael D. West dated December 31, 2004 (previously filed as Exhibit 10.39 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.39.1    Amendment No. 1 to Employment Agreement between ACT and Michael D. West dated August 1, 2005 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on August 5, 2005 (File No. 000-50295) and incorporated by reference herein).

10.40    Employment Agreement between ACT and Robert Lanza dated February 1, 2005 (previously filed as Exhibit 10.40 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

| 10.41 | Employment Agreement between the Registrant, ACT and James G. Stewart dated March 13, 2005 (previously filed as Exhibit 10.41 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
|---|---|
| 10.41.1 | Amendment to Employment Agreement between the Registrant and James G. Stewart dated September 16, 2005 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 22, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.42 | Employment Agreement between ACT and Robert Peabody dated February 9, 2005 (previously filed as Exhibit 10.42 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.43 | Employment Agreement between ACT and Jonathan Atzen dated April 1, 2005 (previously filed as Exhibit 10.43 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.44 | Employment Agreement between ACT and Irina Klimanskaya dated October 1, 2003 (previously filed as Exhibit 10.44 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.45 | Employment Agreement between ACT and Sadhana Agarwal dated April 1, 2004 (previously filed as Exhibit 10.45 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.46 | Employment Agreement between ACT and James Murai dated February 17, 2005 (previously filed as Exhibit 10.46 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.47 | Employment Agreement between ACT and David Larocca dated February 9, 2005 (previously filed as Exhibit 10.47 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.48 | Consulting Agreement between ACT and William M. Caldwell, IV dated October 1, 2004 (previously filed as Exhibit 10.48 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.49 | Consulting Agreement between ACT and Jonathan Atzen dated January 14, 2005 (previously filed as Exhibit 10.49 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.50 | Consulting Agreement between ACT and Stephen Price dated December 31, 2004 (previously filed as Exhibit 10.50 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.50.1 | Consulting Agreement between ACT and Stephen Price dated April 28, 2005 (previously filed as Exhibit 10.50.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.51 | Consulting Agreement between ACT and Chad Griffin dated April 1, 2005 (previously filed as Exhibit 10.51 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.52 | Consulting Agreement between ACT and James Stewart dated January 14, 2005 (previously filed as Exhibit 10.52 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.53 | Settlement Agreement between ACT and Gunnar Engstrom dated January 28, 2005 (previously filed as Exhibit 10.53 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.54 | Confidentiality and Nondisclosure Agreement dated February 3, 1999 between ACT and Robert Lanza, M.D. (previously filed as Exhibit 10.54 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.55 | Consulting Agreement dated September 29, 1997 between ACT and Dr. James Robl (previously filed as Exhibit 10.55 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.56 | Consulting Agreement dated January 23, 1998 between ACT and Dr. James Robl (previously filed as Exhibit 10.56 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.57 | Final Settlement Agreement dated August 6, 1999 between Infigen, Inc., ACT and Steven Stice (previously filed as Exhibit 10.57 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein). |
| 10.58 | Letter Agreement dated April 20, 2000 between ACT and Dr. Steven L. Stice (previously filed as Exhibit 10.58 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference |

herein).

10.59     Master Laboratory Services Agreement dated as of January 4, 2001 between White Eagle Laboratories, Inc. and ACT
          (previously filed as Exhibit 10.59 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-
          50295) and incorporated by reference herein).

65

10.60     Master Study Agreement dated as of December 4, 2000 between Biomedical Research Models, Inc. and ACT (previously filed as Exhibit 10.60 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.61     Agreement Relating to the Transfer of Biological Materials dated as of February 3, 2000 between Wake Forest University and ACT (previously filed as Exhibit 10.61 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.62     Materials Transfer Agreement dated February 16, 2000 between ACT, B.C. Cancer Agency and Dr. Peter Lansdorp (previously filed as Exhibit 10.62 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.63     Materials Transfer Agreement dated January 19, 2000 between ACT, IPK and Anna Wobus (previously filed as Exhibit 10.63 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.64     Materials Transfer Agreement dated February 23, 2000 between ACT, Philip Damiani and Carlos T. Moraes (previously filed as Exhibit 10.64 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.65     Material Transfer Agreement dated January 6, 1997 between ACT, University of Massachusetts, University of Colorado and Curtis R. Freed (previously filed as Exhibit 10.65 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000- 50295) and incorporated by reference herein).

10.66     Material Transfer Agreement dated March 20, 2000 between ACT, Charlotte Farin and Peter Farin (previously filed as Exhibit 10.66 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.67     Sponsored Research Agreement dated as of May 15, 2000 between Carl H. Lindner, Jr. Family Center for Research of Endangered Wildlife (CREW) and ACT (previously filed as Exhibit 10.67 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.68     Sponsored Research Agreement dated as of August 9, 2000 between Cornell University and ACT (previously filed as Exhibit 10.68 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.69     Sponsored Research Agreement dated as of December 1, 1999 between ACT and the University of Massachusetts Amherst (previously filed as Exhibit 10.69 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.69.1     Amendment No. 1 to Agreement dated December 1, 1999 (previously filed as Exhibit 10.69.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.70     Sponsored Research Agreement dated August 1, 1999 between ACT and UMass (D. Good) (previously filed as Exhibit 10.70 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.71     Term Sheet for Non-Exclusive License Agreement dated as of December 23, 2000 between Immerge BioTherapeutics, Inc. and ACT, as amended by First Amendment to Term Sheet dated March 14, 2001 (previously filed as Exhibit 10.71 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.72     Withdrawal, Termination, Assignment and Assumption Agreement dated March 14, 2001 by and among ACT, BioTransplant, Inc., Immerge BioTherapeutics, Inc. and Infigen, Inc. (previously filed as Exhibit 10.72 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.73     Consulting Agreement between ACT and Karen Chapman dated January 15, 2005 (previously filed as Exhibit 10.73 to the Registrant's Quarterly Report on Form 10-QSB filed on May 23, 2005 (File No. 000-50295) and incorporated by reference herein).

10.74     Research Collaboration Agreement between ACT and The Burnham Institute dated May 23, 2005 (previously filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-QSB filed on August 15, 2005 (File No. 000-50295) and incorporated by reference herein).

10.75     Securities Purchase Agreement dated September 15, 2005 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.76     Registration Rights Agreement dated September 15, 2005 (previously filed as Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.77     Form of Common Stock Purchase Warrant (previously filed as Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.78     Form of Amortizing Convertible Debenture (previously filed as Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.79    Form of Lock-up Agreement (previously filed as Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.80    Settlement Agreement dated September 14, 2005 (previously filed as Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.81    Form of Convertible Promissory Note (Unsecured) (previously filed as Exhibit 10.7 to the Registrant's Current Report on Form 8- K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.82    Form of Warrant to Purchase Securities (previously filed as Exhibit 10.8 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.83    Agreement between Advanced Cell Technology, Inc., Advanced Cell, Inc. and A.C.T. Group, Inc. dated September 15, 2005 (previously filed as Exhibit 10.9 to the Registrant's Current Report on Form 8-K filed on September 19, 2005 (File No. 000-50295) and incorporated by reference herein).

10.84    Agreement between Capital Financial Media, LLC and Advanced Cell Technology, Inc., dated February 9, 2006 (previously filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-QSB filed on May 15, 2006 (File No. 000-50295) and incorporated by reference herein).

10.85    Sublease Agreement between Avigen, Inc. and Advanced Cell Technology, Inc., dated November 29, 2005. (previously filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-QSB filed on May 15, 2006 (File No. 000-50295) and incorporated by reference herein).

10.86    Exclusive Sublicense Agreement between Advanced Cell Technology, Inc. and TranXenoGen, Inc., dated March 29, 2006 (previously filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-QSB filed on May 15, 2006 (File No. 000-50295) and incorporated by reference herein).

10.87    Non-Exclusive License Agreement between Kirin Beer Kabushiki Kaisha, Aurox, LLC, Hematech, LLC, and Kirin SD, Inc., and Advanced Cell Technology, Inc., dated May 9, 2006 (previously filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-QSB filed on August 11, 2006 (File No. 000-50295) and incorporated by reference herein).

10.88    Exclusive License Agreement between Kirin Beer Kabushiki Kaisha, Aurox, LLC, Hematech, LLC, and Kirin SD, Inc., and Advanced Cell Technology, Inc., dated May 9, 2006 (previously filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-QSB filed on August 11, 2006 (File No. 000-50295) and incorporated by reference herein).

10.89    Purchase Agreement between Kirin SD, Inc. and Advanced Cell Technology, Inc., dated May 9, 2006(previously filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-QSB filed on August 11, 2006 (File No. 000-50295) and incorporated by reference herein).

10.90    Consulting Agreement between Advanced Cell Technology, Inc. and James G. Stewart, dated August 17, 2006 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on August 18, 2006 (File No. 000-50295) and incorporated by reference herein).

10.91    Securities Purchase Agreement dated August 30, 2006 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 8, 2006 (File No. 000-50295) and incorporated by reference herein).

10.92    Registration Rights Agreement dated September 15, 2005 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 8, 2006 (File No. 000-50295) and incorporated by reference herein).

10.93    Form of Common Stock Purchase Warrant (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 8, 2006 (File No. 000-50295) and incorporated by reference herein).

10.94    Form of Amortizing Convertible Debenture (previously filed as Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed on September 8, 2006 (File No. 000-50295) and incorporated by reference herein).

10.95    Form of Lock-up Agreement (previously filed as Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed on September 8, 2006 (File No. 000-50295) and incorporated by reference herein).

10.96    Amendment No. 1, dated as of January 11, 2007, to the Securities Purchase Agreement, dated August 30, 2006, the Amortizing Convertible Debenture, dated September 6, 2006, and the Registration Rights Agreement, dated August 30, 2006 (previously filed as Exhibit 10.97 to the Registrant's Registration Statement on Form SB-2 filed on January 26, 2007 (File No. 333-140265) and incorporated by reference herein).

10.97    Amendment No. 1, dated as of January 11, 2007, to the Securities Purchase Agreement, the Amortizing Convertible Debenture, and the Registration Rights Agreement, each dated August 30, 2006 (previously filed as Exhibit 10.97 to the Registrant's Registration Statement on Form SB-2 filed on January 26, 2007 (File No. 333-140265) and incorporated by reference herein).

10.98    Patent Assignment Agreement between Advanced Cell Technology, Inc. and Infigen, Inc., dated February 5, 2007 (previously filed as Exhibit 10.98 to the Registrant's Post-Effective Amendment No. 3 to its Registration Statement on Form SB-2 filed on March 28, 2007 and incorporated by reference herein).

10.99    Employment Agreement between Advanced Cell Technology, Inc. and Pedro Huertas, M.D., Ph.D., dated February 5, 2007 (previously filed as Exhibit 10.99 to the Registrant's Post-Effective Amendment No. 3 to its Registration Statement on Form SB-2 filed on March 28, 2007 and incorporated by reference herein).

10.100   Research Services Agreement between Advanced Cell Technology, Inc. and Oregon Health & Science University, dated February 5, 2007 (previously filed as Exhibit 10.100 to the Registrant's Post-Effective Amendment No. 3 to its Registration Statement on Form SB-2 filed on March 28, 2007 and incorporated by reference herein).

10.101   Agreement and Plan of Merger by and among Advanced Cell technology, Inc., ACT Acquisition Sub, Inc., Mytogen, Inc. and certain shareholders of Mytogen, Inc., dated as of July 31, 2007 (previously filed as exhibit 10.101 to the Amendment No. 1 to the Registrant's 10-KSB for the year ended December 31, 2007 filed with the SEC on June 30, 2008 and incorporated by reference herein).

10.102   Escrow Agreement by and among Advanced Cell Technology, Inc. and certain former shareholders of Mytogen, Inc., dated as of September 20, 2007 (previously filed as exhibit 10.102 to the Amendment No. 1 to the Registrant's 10-KSB for the year ended December 31, 2007 filed with the SEC on June 30, 2008 and incorporated by reference herein)

10.103   Securities Purchase Agreement dated August 31, 2007 (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.104   Registration Rights Agreement dated August 31, 2007 (previously filed as Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.105   Form of Common Stock Purchase Warrant (previously filed as Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.106   Form of Amortizing Convertible Debenture (previously filed as Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.107   Form of Security Agreement dated August 31, 2007 (previously filed as Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.108   Form of Subsidiary Guaranty dated August 31, 2007 (previously filed as Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.109   Form of Lock-up Agreement (previously filed as Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed on September 7, 2007 (File No. 000-50295) and incorporated by reference herein).

10.110   Amended and Restated Consulting Agreement, dated as of September 19, 2007 by and between Advanced Cell Technology, Inc., through its wholly owned subsidiary Mytogen, Inc., and Dib, LLC. (previously filed as Exhibit 10.110 to the Registrant's Registration Statement on Form SB-2 filed on October 1, 2007 and incorporated by reference herein).

10.111   Employment Agreement, dated as of September 20, 2007, by and between Advanced Cell technology, Inc., and Jonathan Dinsmore. (previously filed as Exhibit 10.111 to the Registrant's Registration Statement on Form SB-2 filed on October 1, 2007 and incorporated by reference herein).

10.112   Nomination Agreement, dated September 20, 2007, by and between Advanced Cell Technology, Inc. and Anthem Ventures Fund, LP. (previously filed as Exhibit 10.112 to the Registrant's Registration Statement on Form SB-2 filed on October 1, 2007 and incorporated by reference herein).

10.113   Securities Purchase Agreement dated March 31, 2008, by and among the Company and the investors party thereto (previously filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.114   Security Agreement dated March 31, 2008, by and among the Company and the investors party thereto (previously filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.115   Form of Common Stock Purchase Warrant issued in connection with March 31, 2008 Securities Purchase Agreement (previously filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.116   Form of Amortizing Convertible Debenture issued in connection with March 31, 2008 Securities Purchase Agreement (previously filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.117   Subsidiary Guarantee dated March 31, 2008 (previously filed as Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.118   Convertible Note, dated as of March 17, 2008, issued by the Company to PDPI LLC (previously filed as Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.119   Bridge Note, dated as of March 17, 2008, issued by the Company to The Shapiro Family Trust Dated September 25, 1989 (previously filed as Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

10.120   License Agreement, dated as of February 25, 2008, by and between the Company and Pharming Technologies B.V (previously filed as Exhibit 10.8 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference).

| 10.121 | Convertible Promissory Note A, dated as of February 15, 2008, issued by the Company to JMJ Financial (previously filed as Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference). |
| --- | --- |
| 10.122 | Convertible Promissory Note B , dated as of February 15, 2008, issued by the Company to JMJ Financial, and Amendment to Convertible Promissory Note B, dated as of March 17, 2008 (previously filed as Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference). |
| 10.123 | Secured & Collateralized Promissory Note, dated as of February 15, 2008, issued by JMJ Financial to the Company (previously filed as Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference). |
| 10.124 | Collateral & Security Agreement, dated as of February 15, 2008, by and between the Company and JMJ Financial (previously filed as Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed on July 15, 2008 and incorporated herein by reference). |

67

| 10.125 | Consent, Amendment and Exchange Agreement, dated as of July 29, 2009, by and between the Company and the holders named on the signature pages thereto (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on August 4, 2009 and incorporated herein by reference). |
| --- | --- |
| 10.126 | Consent, Amendment and Exchange Agreement, dated as of July 29, 2009, by and between the Company and the senior noteholders named on the signature pages thereto (previously filed as Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on August 4, 2009 and incorporated herein by reference). |
| 10.127 | Preferred Stock Purchase Agreement, dated November 2, 2009, between Advanced Cell Technology, Inc, and Optimus Capital Partners, LLC, dba Optimus Life Sciences Capital Partners, LLC (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.128 | Warrant, dated November 2, 2009   (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.129 | Subscription Agreement, dated November 12, 2009 (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.130 | Form of Class A Warrant (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.131 | Form of Class B Warrant (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.132 | Form of Additional Investment Right (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.133 | Employment Agreement, dated October 1, 2009, between the Company and Robert P. Lanza (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on November 17, 2009 and incorporated herein by reference). |
| 10.134 | Form of Note (previously filed as exhibit to the Registrant's S-1 filed on November 18, 2009 and incorporated herein by reference) |
| 10.135 | Employment Agreement, dated February 18, 2010, between the Company and William Caldwell |
| 10.136 | Promissory Note, dated January 19, 2010, issued to JMJ Financial (previously filed as exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.137 | Promissory Note, dated March 30, 2010, in principal amount of $600,000, issued to JMJ Financial (previously filed as exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.138 | Promissory Note, dated March 30, 2010, in principal amount of $1,200,000, issued to JMJ Financial (previously filed as exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.139 | Promissory Note, dated March 30, 2010, in principal amount of $1,700,000, issued to JMJ Financial (previously filed as exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.140 | Letter Agreement, dated March 30, 2010, between the Company and JMJ Financial (previously filed as exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.141 | Registration Rights Agreement, dated March 30, 2010, between the Company and JMJ Financial (previously filed as exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed on November 9, 2010 and incorporated herein by reference). |
| 10.142 | Settlement Agreement and Mutual Release between the Company and Bristol Investment Fund, Ltd and Bristol Capital, LLC (previously filed as exhibit 99.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2010 and incorporated herein by reference). |
| 10.143 | Form of Warrant for Series C Preferred transaction (previously filed as exhibit 4.1 to the Registrant's Current Report on Form 8-K filed on January 3, 2011 and incorporated herein by reference). |
| 10.144 | Form of Initial Warrant for Series C Preferred transaction (previously filed as exhibit 4.2 to the Registrant's Current Report on Form 8-K filed on January 3, 2011 and incorporated herein by reference). |
| 10.145 | Securities Purchase Agreement, dated as of December 30, 2010, by and among Advanced Cell Technology, Inc. and Socius CG II Ltd. (previously filed as exhibit 99.1 to the Registrant's Current Report on Form 8-K filed on January 3, 2011 and incorporated herein by reference). |
| 10.146 | Letter Agreement, dated December 30, 2010, by and among Advanced Cell Technology, Inc. and Optimus CG II, Ltd. (previously filed as exhibit 99.2 to the Registrant's Current Report on Form 8-K filed on January 3, 2011 and incorporated herein by reference). |
| 10.147 | Employment Agreement, dated December 14, 2010, between the Company and Gary Rabin. |

| | |
|---|---|
| 10.148 | Settlement Agreement and Mutual Release between the Company and Transition Holdings, Ltd. dated February 9, 2011. |
| 10.149 | Settlement Agreement and Mutual Release between the Company and Gemini Master Fund, Ltd. dated February 11, 2011. |
| 23.1 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Certification of the Principal Executive Officer and Principal Financial Officer Pursuant to Rule 13a-14 of the Securities Exchange Act of 1934 |
| 32.1 | Certification of Principal Executive Officer and Principal Financial Officer Pursuant to Section 1350 |

68

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ADVANCED CELL TECHNOLOGY, INC.

Dated: March 17, 2011

By: /s/ Gary Rabin

Gary Rabin
Interim Chief Executive Officer and Chairman
(Principal Executive Officer, Principle Financial
Officer and Principal Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

/s/ Gary Rabin                                                          March 17, 2011

Gary Rabin
Interim Chief Executive Officer and
Chairman of the Board of Directors
(Principal Executive Officer, Principal
Financial Officer and Principal Accounting Officer

/s/ Erkki Ruoslahti, M.D., Ph.D.                                       March 17, 2011

Erkki Ruoslahti, M.D., Ph.D.
 Director

/s/ Alan Shapiro                                                       March 17, 2011

Alan Shapiro
Director

69