United States District Court
Southern District of New York

-------------------------------------------------------x

Alpha Capital Anstalt,

                Plaintiff,

    v.

Advanced Cell Technology, Inc.,

                Defendant.

-------------------------------------------------------x

H Civ 6458 (PAC)

Plaintiff's Memorandum of Law
In Support of Its Motion for
A Preliminary Injunction and
<u>for Preliminary Declarative Relief</u>

Law Offices of Kenneth A. Zitter
Attorneys for Plaintiff,
  Alpha Capital Anstalt
260 Madison Avenue
New York, New York 10016
212-532-8000

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Plaintiffs Have Met the Standard for
the Issuance of a Preliminary Injunction
and Preliminary Declarative Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.     The Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.     Alpha Capital's Likelihood of Success on the Merits is Overwhelming . . . . . . . . 6

      i.     The Warrants and Convertible Notes
require ACTI to deliver  at least
39,514,859 shares of its common
stock to Alpha Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C.     Alpha Capital Will Suffer Irreparable Harm if
Preliminary Injunctive Relief is Not Granted . . . . . . . . . . . . . . . . . . . . . . . . 10

      i.     The parties agreed in writing that
ACTI's failure to deliver stock would
cause Alpha Capital irreparable harm
and entitle Alpha Capital to injunctive relief . . . . . . . . . . . . . . . 10

      ii.    ACTI is unlikely to be able to
to satisfy any ultimate damages award . . . . . . . . . . . . . . . . . . . . 11

      iii.   Difficulty in calculating damages
constitutes irreparable harm warranting
injunctive relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      iv.   Money damages are not an adequate remedy
for the breach by a public corporation
of the terms of its publicly held securities . . . . . . . . . . . . . . . . . 16

v. Other courts under similar circumstances have granted preliminary injunctions and compelled corporations to deliver shares in accordance with their contractual obligations to do so . . . . . . . . . . . . . . . . . . . . . . 18

Point 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Alpha Capital Should Not Be Required to Post a Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Table of Authorities

*Alpha Capital Aktiengesellschaft v. Advanced Viral Research, Corp.,*
2003 WL 328302 (S.D.N.Y. Feb. 11, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Alpha Capital Aktiengesellschaft v. Group Management Corp.,*
2002 WL 31681798 (S.D.N.Y. Nov 25, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 18

*Alvenus Shipping v. Delta Petroleum (U.S.A.) Ltd.,*
876 F. Supp. 482 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brenntag International Chemicals, Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Celeste Trust Reg. and Esquire Trade & Finance, Inc. v.*
*Greystone Digital Technology, Inc.,* 01 Civ. 91 (CBM) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Delaware-New Jersey Ferry Co. v. Leeds,* Del.Ch., 186 A. 913 (1936) . . . . . . . . . . . . . . . . 17

*Department of Urban Development v. K. Capolino Construction Corp.,*
2001 U.S. Dist. LEXIS 5825 (S.D.N.Y. May 7, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Doctor's Associates v. Stuart,* 85 F.3d 975 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dunkin' Donuts Inc. v. National Donut Restaurants of*
*New York, Inc.,* 291 F. Supp.2d 149 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

*Fleet National Bank v. Trans World Airlines,* 767 F. Supp.
510 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Great Earth Intern. Franchising Corp. v. Milks Developments, Inc.,*
302 F.Supp.2d 248 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Halifax Fund, L.P. v. Response U.S.A., Inc.,* 1977
WL 33173241 (Del. Ch. May 13, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*HFTP Investments L.L.C. v. Ariad Pharmaceuticals,*
752 A.2d 115 (Del. Ch. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir. 1974)
*cert. denied,* 94 S. Ct. 2644, 417 U.S. 932, 41 L. Ed. 2d 236 (1974) . . . . . . . . . . . . . . . . . 22

*Kamine/Besicorp. Allegany L.P. v. Rochester Gas & Electric Corp.*,
908 F. Supp. 1180 (W.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*La Plaza Defense League v. Kemp*, 742 F. Supp. 792 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . 21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*,
868 F. Supp. 532 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp.2d 118 (S.D.N.Y. 2000) . . . . . . . . . . . . . 5

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) . . . . . . . . . . . . . . . . 3, 11

*Polymer Technology Corp. v. Mimran*, 37 F.3d 74 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 3

*Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904 (2d Cir. 1990) . . . . . . . . . . . . . . 3

*Seide v. Crest Color, Inc.*, 835 F. Supp. 732 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sovereign Business Forms, Inc. v. Sternrite Industries, Inc.*,
2000 WL 1772599 (S.D.N.Y. Nov. 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
60 F.3d 27 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*,
277 F. Supp.2d 356 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Federal Rules of Civil Procedure:

Rule 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 31

Rule 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Treatises:

11A Wright, Miller & Kane, *Federal Practice and Procedure*,
Sec. 2948.1, p. 151-53 (1995 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11A Wright, Miller and Kane, *Federal Practice and Procedure*,
Sec. 2954 (1995 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. §2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States District Court
Southern District of New York
----------------------------------------------------------x

Alpha Capital Anstalt,

                              Plaintiff,

          v.

Advanced Cell Technology, Inc.,


                              Defendant.


----------------------------------------------------------x


Plaintiff's Memorandum of Law
In Support of Its Motion for
A Preliminary Injunction and
for Preliminary Declarative Relief

This memorandum of law is submitted by Plaintiff Alpha Capital Anstalt ("Alpha

Capital") in support of its motion, under Fed. R. Civ. P. Rule 65 and 28 U.S.C. §2201, for a

preliminary injunction and for preliminary declarative relief against Defendant Advanced Cell

Technology, Inc. ("ACTI").


Alpha Capital seeks an order, pending final determination of this action, directing ACTI

to deliver immediately at least 39,514,859 shares of its common stock to Alpha Capital pursuant

to the terms of the ACTI Warrants (the "Warrants") and Convertible Promissory Notes (the

"Convertible Notes") held by Alpha Capital. ACTI, as hereafter set forth, has failed in its

undisputable contractual obligation to deliver such shares of common stock. Alpha Capital also

seeks an order compelling ACTI to respond immediately to an interrogatory seeking information

relating to sales and issuances of ACTI stock since November 12, 2009, which information ACTI was contractually obligated, but failed, to provide to Alpha Capital. That information is important for Alpha Capital to be certain it is receiving the proper number of shares.

The Facts

The facts of this matter have been adequately set forth in the affirmation of Konrad Ackermann served herewith and will not be repeated at length herein. Suffice it to say that ACTI, under the terms of the Warrants and Convertible Promissory Notes held by Alpha Capital, and the terms of the Subscription Agreement pursuant to which Alpha Capital acquired those securities, is contractually required to deliver immediately at least 39,514,859 shares of its common stock to Alpha Capital. ACTI has also failed to comply with its contractual obligation to notify Alpha Capital of all sales or issuances of its common stock since November, 2009 at prices less than $0.10, which sales or issuances trigger a reduction of the Exercise and Conversion Prices of the securities held by Alpha Capital and enable Alpha Capital to calculate correctly the number of additional shares which ACTI is obligated to deliver to Alpha Capital.

Absent an award of the requested preliminary injunctive relief, Alpha Capital will suffer irreparable harm. ACTI is insolvent. It continues in business only because it raises new funds by selling new securities and pays its existing debt with stock instead of cash. It has never earned a profit and does not anticipate any significant revenues in the foreseeable future. Alpha Capital, therefore, is highly unlikely to recover on any damages award at the end of the case. Further,

2

Alpha Capital's damages will be difficult to establish with precision. Those factors, as hereafter set forth, constitute irreparable harm warranting an award of the requested preliminary injunctive relief.

## Argument

### Point 1

Alpha Capital Has Met the Standard for
the Issuance of a Preliminary Injunction
and Preliminary Declarative Relief

A. The Standard

The Second Circuit's standard for the grant of a preliminary injunction under Fed. R. Civ. P. Rule 65 is well known. As the court stated in *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir. 1995):

> "A party seeking injunctive relief ordinarily must show: (a) that it
> will suffer irreparable harm in the absence of an injunction and (b)
> either (i) a likelihood of success on the merits or (ii) sufficiently
> serious questions going to the merits to make them a fair ground for
> litigation and a balance of hardships tipping decidedly in the
> movant's favor."

See also: *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999); *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994); *Reuters Ltd. v. United Press International, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990).

3

Where, however, a party seeks not simply to maintain the *status quo* but seeks a mandatory injunction which alters the *status quo*, the movant must show a "clear" or "substantial" likelihood of success on the merits (not merely a "likelihood" of success).[1] As the court stated in *Tom Doherty Associates, Inc., supra,* at p. 34:

> "The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. See *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985). A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act, *See id.* As noted above, this distinction is important because we have held that a mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (internal quotations and citations omitted): *see also SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d. Cir. 1990) (injunction going beyond preservation of status quo requires "a more substantial showing of likelihood of success"); *Jacobson & Co. v. Armstrong Cork Co.* 548, F.2d 438, 441 (2d Cir. 1977). The "clear" or "substantial" showing requirement - the variation in language does not reflect a variation in meaning - thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success. See *Unifund SAL,* 910 F.2d at 1039.

See: *Great Earth Intern. Franchising Corp. v. Milks Developments, Inc.,* 302 F.Supp.2d 248, 251 (S.D.N.Y. 2004); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,* 277 F. Supp.2d 356, 361 (S.D.N.Y. 2003); *Dunkin' Donuts Inc. v. National Donut Restaurants of New York, Inc.,* 291

---

[1]Whether compelling ACTI to comply with its clear contractual obligation to deliver stock constitutes "maintaining the status quo" or constitutes a "change in the status quo" is, under the circumstances of this case, a distinction without a difference. See *Alpha Capital Aktiengesellschaft v. Group Management Corp.,* 2002 WL 31681798 at *10 (S.D.N.Y. Nov 25, 2002). ACTI's contractual obligation to deliver the stock is clear and unequivocal, and, therefore, Alpha Capital has met either standard in connection with the issuance of a preliminary injunction.

F. Supp.2d 149, 151 (E.D.N.Y. 2003)  *Muze, Inc. v. Digital On-Demand, Inc.,* 123 F. Supp.2d 118, 126 (S.D.N.Y. 2000).

The standard for preliminary declarative relief is the same. This Court clearly has the power to award preliminary declarative relief. As the court stated in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*, 868 F. Supp. 532, 535 (S.D.N.Y. 1994):

> "Given the ability of the Court to issue a final declaratory judgment under 28 U.S.C. Sec. 2201, which is equitable in nature, this Court also has the power to issue such provisional equitable relief when it is necessary, based on the urgency of the situation, the irreparable harm that would otherwise occur, and the remaining factors which courts consider when granting provisional injunctive relief."

The court then stated that preliminary declarative relief should be conditioned on the same standards applicable to motions for preliminary injunctions. *Merrill Lynch, supra*, 868 F. Supp. at 536.

As is hereafter set forth, Alpha Capital meets the standard for an award of the requested preliminary injunctive and declarative relief.

B. <u>Alpha Capital's Likelihood of Success on the Merits is Overwhelming</u>.

As noted above, the cases generally require merely "a likelihood of success on the merits" for the grant of a preliminary injunction. Where a mandatory injunction is sought, a plaintiff must make a showing of a substantial likelihood of success. In this case, Plaintiff's likelihood of success at trial is not merely substantial but virtually assured.

i.  The Warrants and Convertible Notes
    require ACTI to deliver at least
    39,514,859 shares of its common
    <u>stock to Alpha Capital</u>

In the event ACTI issued any shares, or any securities convertible into shares, at a price lower than the then applicable Exercise Price of the Warrants and the Conversion Price of the Convertible Notes held by Alpha Capital, then ACTI was obligated: i) to lower the Exercise and Conversion Prices of the Warrants and Convertible Notes to such new lower price; and ii) to increase the number of shares covered by the Warrants in accordance with an agreed upon formula. Thus Sections 3.3 of the Warrants and 3.1(c)D of the Convertible Notes provide for the reduction of the Exercise and Conversion Prices of those securities and an increase in the Warrant coverage in the event of such a new issuance at a lower price:

> Warrant, ¶3.3: <u>Share Issuance</u>. Until the Expiration Date, if the
> Company shall issue any Common Stock . . . prior to the complete
> exercise of this Warrant for a consideration less than the Purchase
> Price [Exercise Price] that would be in effect at the time of such
> issue, then, and thereafter successively upon each such issue, the

6

Purchase Price [Exercise Price] shall be reduced to such other lower price for the then outstanding Warrants. For purposes of this adjustment, the issuance of any security or debt instrument of the Company carrying the right to convert such security or debt instrument into Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Purchase Price [Exercise Price] upon the issuance of the above described security, debt instrument, warrants, right, or option if such issuance is at a price lower than the Purchase Price [Exercise Price] in effect upon such issuance and again at any time upon any subsequent issuances of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the Purchase Price [Exercise Price] in effect upon such issuance . . . Upon any reduction of the Purchase Price [Exercise Price], the number of shares of Common Stock that the Holder of this Warrant shall thereafter, on the exercise hereof, be entitled to receive shall be adjusted to a number determined by multiplying the number of shares of Common Stock that would otherwise (but for the provisions of this Section 3.3) be issuable on such exercise by a fraction of which (a) the numerator is the Purchase Price [Exercise Price] that would otherwise (but for the provisions of this Section 3.3) be in effect, and (b) the denominator is the Purchase Price [Exercise Price] in effect on the date of such exercise.

Convertible Notes ¶3.1(c)D: <u>Share Issuance</u>. So long as this Note is outstanding, if the Borrower shall issue any Common Stock . . . prior to the complete conversion or payment of this Note, for a consideration per share that is less than the Fixed Conversion Price that would be in effect at the time of such issue, then, and thereafter successively upon each such issuance, the Fixed Conversion Price shall be reduced to such other lower issue price. For purposes of this adjustment, the issuance of any security or debt instrument of the Borrower carrying the right to convert such security or debt instrument into Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Fixed Conversion Price upon the issuance of the above described security, debt instrument, warrant, right, or option and again upon the issuance of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the then applicable Fixed Conversion Price.

In order to insure that Alpha Capital could always exercise its Warrants and convert its Convertible Notes at the proper Exercise and Conversion Price, and receive the proper number of shares of common stock, both the Warrants and the Convertible Notes required ACTI to notify Alpha Capital immediately of any share issuances at a lower price. ACTI also agreed to calculate the new lower Exercise and Conversion Prices applicable to the Alpha Capital Warrants and Convertible Notes upon any such share issuance. Thus para. 5 of the Warrants and para. 3.1(d) of the Convertible Notes provide:

> Warrants ¶5: "Certificate as to Adjustments. In each case of any adjustment or readjustment in the shares of Common Stock (or Other Securities) issuable on the exercise of the Warrants, the Company at its expense will promptly cause its Chief Financial Officer or other appropriate designee to compute such adjustment or readjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (a) the consideration received or receivable by the Company for any additional shares of Common Stock (or Other Securities) issued or sold or deemed to have been issued or sold, (b) the number of shares of Common Stock (or Other Securities) outstanding or deemed to be outstanding, and (c) the Purchase Price and the number of shares of Common Stock to be received upon exercise of this Warrant, in effect immediately prior to such adjustment or readjustment and as adjusted or readjusted as provided in this Warrant. The Company will forthwith mail a copy of each such certificate to the Holder of the Warrant and any Warrant Agent of the Company (appointed pursuant to Section 11 hereof)."

> Convertible Notes ¶3.1(d): "Whenever the Conversion Price is adjusted pursuant to Section 3.1 (c) above, the Borrower [ACTI] shall promptly mail to the Holder a notice setting forth the Conversion Price after such adjustment and setting forth a statement of the facts requiring such adjustment."

8

Alpha Capital learned for the first time from a form 8-K filed by ACTI on August 17, 2011, that ACTI had earlier entered into an agreement to settle claims brought by other investors in the same Warrants and Convertible Notes which Alpha Capital held. In that settlement, ACTI issued shares at a price well below the $0.10 price which Alpha Capital believed was applicable to its exercise of its Warrants and conversions of its Convertible Notes. ACTI never complied with its obligations to notify Alpha Capital of that settlement and the terms thereof. Nor did ACTI ever perform the calculations it was required to perform pursuant to the Warrants and Convertible Notes to arrive at the new applicable Exercise and Conversion Price.

ACTI's entry into the settlement agreement in August 2011 and its failure to comply with its notice and other obligations under the terms of the Warrants and Convertible Notes prompted Alpha Capital to review ACTI's public filings to determine if ACTI had previously issued other securities which reduced the Exercise and Conversion Price of the Alpha Capital Warrants and Convertible Notes. Alpha Capital discovered that ACTI had entered into a transaction with JMJ Financial, Inc., in which, according to the incomplete information publicly available, ACTI apparently issued shares at a price of $0.0353. At that price, ACTI was obligated to deliver 39,514,859 shares of its common to Alpha Capital. It appeared likely to Alpha Capital that shares were issued at even lower prices requiring the delivery of even more shares. Alpha Capital's attempt to obtain that information from ACTI has been futile, despite ACTI's contractual obligation to provide that information.

The fact that ACTI issued shares at less than the Exercise and Conversion Prices then applicable to Alpha Capital's Warrants and Convertible Notes is undisputable. The fact that ACTI failed to honor its contract obligation to notify Alpha Capital of all such stock issuances is undisputable. Alpha Capital's best calculation of the shares of stock which ACTI is obligated to deliver - 39,514,859 - is based upon the best information available to Alpha Capital, although it is likely that ACTI is required to deliver to Alpha Capital even more shares of common stock. Alpha Capital, therefore, has an overwhelming likelihood of success on the merits of its claims.

C.  Alpha Capital Will Suffer Irreparable Harm if Preliminary Injunctive Relief is Not Granted.

Alpha Capital also meets the other requirement for a preliminary injunction and preliminary declarative relief -  irreparable harm absent the grant of the injunction. Alpha Capital meets this prong of the test for several reasons.

i.  The parties agreed in writing that
    ACTI's failure to deliver stock
    would cause Alpha Capital irreparable harm
    and entitle Alpha Capital to injunctive relief

The parties, represented by sophisticated counsel, agreed that Alpha Capital would suffer irreparable harm if ACTI failed to comply with its obligations under the Warrants and the Convertible Notes and that Alpha Capital would be entitled to equitable relief to remedy any such failures. Thus paragraph 13(b) of the Subscription Agreement, to which the Warrants and Convertible Notes are exhibits and pursuant to which they were issued, provides:

10

13(b)   <u>Specific Enforcement, Consent to Jurisdiction.</u> The Company and Subscriber acknowledge and agree that irreparable harm would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

The courts in *North Atlantic Instruments v. Haber, supra,* at 49 and in *Ticor Title Insurance Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999) both noted a contractual provision in the agreement under consideration which stated that a breach would cause irreparable injury in finding irreparable injury and in awarding injunctive relief. Indeed, in *Ticor,* the court stated that the acknowledgment of irreparable injury "might arguably be viewed as an admission" in that regard. *Ticor, supra,* 173 F.3d at 69. See also: *Alpha Capital Aktiengesellschaft v. Advanced Viral Research,* 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) (the court noted defendant's acknowledgment of irreparable injury in granting injunctive relief); *Sovereign Business Forms, Inc. v. Sternrite Industries, Inc.,* 2000 WL 1772599 at *13 (S.D.N.Y. Nov. 28, 2000).

ii. ACTI is unlikely to be able to
 satisfy any ultimate damages award

Alpha Capital will suffer irreparable harm if the requested injunctive relief is not awarded because ACTI is unlikely to be able to respond to any ultimate damages award at the end of this case. The likely inability of a defendant to respond in damages at the end of a case constitutes irreparable harm warranting injunctive relief.

11

ACTI, according to its public filings, is a biotechnology company focused on developing and commercializing human embryonic and adult stem cell technology in the emerging fields of regenerative medicine. Its principal activities have included obtaining financing, securing operating facilities, and conducting research and development. ACTI has no therapeutic products currently available for sale and does not expect to have any therapeutic products commercially available for sale for a period of years, if at all (Exhibit K to Ackermann Affirmation). In short, ACTI is a development stage company with no assurance whatsoever that it will have an actual product or be in business at the end of a lengthy litigation.

Even more compelling is ACTI's admission that its "ability to continue its research and development activities is dependent upon the ability of management to obtain additional financing as required (Exhibit K to Ackermann Affirmation)." Alpha Capital should not be compelled to bear the risk that ACTI's management will be able to raise funds in the future, on acceptable terms, to pay any monetary damages award when ACTI's contract obligation is to deliver stock and Alpha Capital, consistent with that obligation, is seeking the stock which ACTI agreed to deliver.

ACTI has a negative net worth as of June 30, 2011, the date of its most recent publicly filed financial statements, of just over $6 million (Exhibit L to Ackermann Affirmation). It has never earned a profit. Indeed, ACTI reports an accumulated deficit of almost $190 million (Exhibit M to Ackermann Affirmation). In the six months ended June 30, 2011, ACTI reported a loss exceeding $8 million (Exhibit M to Ackermann Affirmation). ACTI itself admits, "On a

long term basis, we have no expectation of generating any meaningful revenues from our product candidates for a substantial period of time and will rely on raising funds in capital transactions  to finance our research and development programs (Exhibit N to Ackermann Affirmation). Thus, it is unlikely that ACTI can pay any likely damages award at the end of a lengthy litigation.

Further, as ACTI admits in its public filings, it continues, "to repay [its] debt financings in shares of common stock . . . (Exhibit N to Ackermann Affirmation)." Alpha Capital acquired its Convertible Notes and Warrants in such debt financings. ACTI should not be permitted to claim that Alpha Capital should be compelled to wait until the end of this litigation to obtain a judgment which must then be satisfied from ACTI's assets, if any, while ACTI continues to pay other holders of its debt securities in stock, particularly when it agreed to deliver stock to Alpha Capital, upon exercise of its Warrants and conversion of its Convertible Notes. That, Alpha Capital submits, would be a very inequitable result.

The "irreparable harm" requirement for preliminary injunctive and declaratory relief is met where, as here, the movant has demonstrated that, absent such relief, any potential monetary judgment may well be uncollectible. Thus in *Alvenus Shipping v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) the court stated:

> "As a general rule, irreparable harm is not present when the plaintiff has a claim for money damages....However, an exception to the general rule exists when it is shown that a money judgment will go unsatisfied absent equitable relief."

See also: *Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 735 (S.D.N.Y. 1993); 11A Wright, Miller & Kane, *Federal Practice and Procedure*, Sec. 2948.1, p. 151-53 (1995 ed.)("Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstances, such as a risk that the defendant will become insolvent before a judgement can be collected, may give rise to the irreparable harm necessary for a preliminary injunction."); *Brenntag International Chemicals, Inc. v. Bank of India,* 175 F.3d 245, 250 (2d Cir. 1999)(irreparable harm is presented in "monetary injury situations involving obligations owed by insolvents."); *Department of Urban Development v. K. Capolino Construction Corp.*, 2001 U.S. Dist. LEXIS 5825. *10 (S.D.N.Y. May 7, 2001)("A monetary injury involving an obligation owed by an insolvent party constitutes irreparable injury."); *Alpha Capital Aktiengesellschaft v. Group Management Corp., 2002 WL 31681798* at *11 (S.D.N.Y. Nov. 25, 2002) ("[T]he Second Circuit has made it abundantly clear that irreparable harm is presented in 'monetary situations involving obligations owed by insolvents.'(citing *Brenntag International Chemicals*)").

It is apparent that Alpha Capital cannot be certain that ACTI will be around to pay any ultimate damages award. Rather the only manner by which Alpha Capital can be made whole for ACTI's's breach of its obligation to deliver the shares is by granting the requested injunctive relief. There is certainly no harm in requiring ACTI to comply with its clear contract obligations during the pendency of this action. The Court will simply be compelling ACTI to do what it agreed to do when it took Alpha Capital's. It is entirely appropriate for this Court to hold ACTI to its word.

### iii. Difficulty in calculating damages constitutes irreparable harm warranting injunctive relief

It will also be extremely difficult, if not impossible, to calculate with any certainty the damages resulting from ACTI's failure to deliver the stock. The dates upon which Alpha Capital would have sold the stock it did not receive, and the amounts Alpha Capital would have realized from any such sales, will be difficult to establish with any degree of certainty, particularly given the volatility of ACTI stock (Exhibit I). Further, ACTI's failure to honor its obligation to notify Alpha Capital of changes to the Exercise and Conversion Prices affected Alpha Capital's business decisions regarding when to exercise its Warrants and when to convert its Convertible Notes and sell the shares received into the open market. ACTI reached a high of approximately $0.30 and is now trading around $0.16. Knowledge that the proper Exercise and Conversion Prices were $0.0353 would have caused Alpha Capital to exercise its Warrants and convert its Convertible Notes at different times than it in fact did.

When Alpha Capital, however, would have exercised its Warrants and converted its Convertible Notes, based upon receipt of complete and timely contractually required information from ACTI as to the proper Exercise and Conversion Prices and when Alpha Capital would have sold those shares on the open market, will also be difficult, if not impossible to prove. Difficulty in calculating damages, which is clearly present here, is a factor which favors the granting of the requested injunctive relief. See *Ticor Title Insurance Co., supra*. It is for that reason, among others, the parties agreed that Alpha Capital would be entitled to equitable relief.

15

iv. Money damages are not an adequate remedy
for the breach by a public corporation
of the terms of its publicly held securities

Courts have recognized that money damages are simply not an adequate remedy for

failure of a corporation to meet its obligations under the terms of its securities. Courts have held,

in the context of convertible securities, that the only appropriate remedy is to compel the

corporation to issue and deliver the securities which it agreed to issue and deliver. In this case,

the express terms of the Warrants require the delivery of the stock which Plaintiffs seek.  Thus, in

*Halifax Fund, L.P. v. Response U.S.A., Inc.*, 1977 WL 33173241 (Del. Ch. May 13, 1997)

plaintiff brought a motion for summary judgment relating to the corporation's failure to issue

common shares to plaintiff upon conversion of plaintiff's convertible preferred shares. Plaintiff

sought to have the common shares issued. Defendant, among other points, argued that plaintiff's

remedy for the corporation's failure to honor its contractual obligation to issue the shares was

limited to damages. In his decision on the summary judgment motion the Delaware vice

chancellor stated, 1977 WL 33173241 at *3:

> "There is no case - the defendant has not been able to cite any case,
> and the court is aware of none - that has the effect of precluding this
> Court from granting specific performance to remedy a clear case of a
> violation of a contract right to convert preferred stock into common
> stock. . . .
>
> In that connection, the Court rejects the defendant's argument that
> plaintiff has an adequate remedy at law, namely damages. In this case,
> only coercive relief will vindicate the rights being enforced . . ."

16

See also: *HFTP Investments L.L.C. v. Ariad Pharmaceuticals*, 752 A.2d 115, 124 (Del. Ch. 1999)("Delaware courts are willing to hear, on an expedited basis, claims by preferred shareholders for equitable relief on the ground that those investors are being wrongfully deprived of their contractual right to convert their shares into common stock.") The court in *Halifax* required the corporation to issue the common shares, in accordance with the terms of the governing instruments. So too, here, the Court should immediately compel ACTI, a public company, to comply with the terms of its publicly Promissory Notes and deliver the requested common stock to Alpha Capital.


The grant of a preliminary injunction in this case is also required to protect the public securities markets. Purchasers of securities issued by public corporations, as is Alpha Capital in this case, should be able to rely on the integrity of the securities they are purchasing. If an investor is purchasing a Warrant and a Convertible Note, he should be able to rely on the fact that a court will enforce the terms of that Warrant and Convertible Note. He should not be relegated to long and costly litigation with complicated proofs of damages, if, as here, the issuing corporation blatantly ignores its contractual obligations. Thus, by issuing the preliminary injunction as requested, the Court will insure the integrity of the public securities markets. In *Delaware-New Jersey Ferry Co. v. Leeds,* Del.Ch., 186 A. 913, 916 (1936), Chancellor Josiah O. Wolcott, writing 75 years ago, stated:

> "If an innocent purchaser for value cannot rely on the verity of what
> the [corporation] itself represented by its certificate to be true, there
> could be no security whatever in transactions of purchase and sale

17

of stocks. Confidence which is the support of all business relations
would be destroyed on a vast and incalculable scale."

·So, too, in this case, ACTI must be compelled to comply with the unequivocal terms of its

Warrants and Convertible Notes.

v.   Other courts under similar circumstances have
     granted preliminary injunctions and compelled
     corporations to deliver shares in accordance with
     their contractual obligations to do so

On January 12, 2001, Judge Whitman Knapp, in a case decided in this court entitled

*Celeste Trust Reg. and Esquire Trade & Finance, Inc. v. Greystone Digital Technology, Inc.,* 01

Civ. 91 (CBM), relying on *Halifax Fund*, granted a preliminary injunction directing the

defendant in that case, pending final determination of the action, to honor its obligation to deliver

securities in accordance with the terms of the convertible securities there at issue. A copy of

Judge Knapp's decision is annexed hereto as Exhibit A.

In *Alpha Capital Aktiengesellschaft et al. v. Group Management Corp. et al., supra,*

plaintiffs moved, as here, for a preliminary injunction seeking, among other relief, an order

directing the defendant therein to issue stock in accordance with its contractual obligation to do

so contained in the securities there at issue. The agreement in that case also provided, as here,

that the failure to deliver the shares constituted irreparable harm and entitled the plaintiffs to

injunctive relief. Defendant was also in precarious financial circumstances and unlikely to be

18

able to respond to any ultimate award of damages. Judge Sand, noting that defendant had entered

into an agreement to issue the stock, granted the preliminary injunction and required the

defendant therein to issue the stock to the plaintiffs and to honor conversion requests.

In *Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp.*, *supra*, the court

granted plaintiffs preliminary injunctive relief requiring Advanced Viral Research Corp. to issue

stock to which plaintiffs were entitled upon exercise of their warrants. The court specifically

noted that there was nothing in the record to indicate that defendant could pay the likely

judgment at the end of the case. Judge Daniels, therefore, awarded the requested preliminary

injunctive relief.

In *Longview Special Finance v. Infinium Labs, Inc.*, 06 Civ. 1772, Judge Holwell granted

a preliminary injunction requiring the defendant to comply with the terms of its convertible

debentures and deliver the common stock for which a conversion notice had been submitted.

Judge Holwell noted plaintiff's showing that the defendant, as here, was insolvent and likely

could not pay money damages at the end of the litigation. He also noted that (Transcript of

hearing on November 29, 2006, p. 21):

> Compelling compliance rather than simply awarding damages
> reinforces the sanctity of bargains between corporations and
> creditors and investors and is consistent with the debenture
> holders' potential exercise of their rights as equity shareholders.

19

A copy of Judge Holwell's decision made at that hearing is annexed hereto as Exhibit B.


In *Alpha Capital Anstalt v. Advanced Cell Technology, Inc.*, 09 Civ. 670, Judge Kaplan granted the requested preliminary injunctive relief and ordered the defendant to deliver the common stock to which plaintiff was entitled upon conversion of its convertible debenture. Judge Kaplan stated (Transcript p. 17): "It is quite clear that the plaintiff would have no adequate remedy at law in the absence of the preliminary injunction which I am now going to grant." A copy of Judge Kaplan's decision made at the hearing is annexed hereto as Exhibit C.

20

<u>Point 2</u>

Alpha Capital Should Not Be
<u>Required to Post a Bond</u>

Rule 65 of the Federal Rules of Civil Procedures states as follows in connection with the

issuance of a preliminary injunction:

> (c)  <u>Security</u>.  No restraining order or preliminary injunction
> shall issue except upon the giving of security by the applicant, in
> such sum as the court deems proper, for the payment of such costs
> and damages as may be incurred or suffered by any party who is
> found to have been wrongfully enjoined or restrained. No such
> security shall be required of the United States or of an officer or
> agency thereof.

Although the Rule is couched in mandatory language, the law is clear, however, that the

Court has discretion with respect to requiring or dispensing with the bond. As the court stated in

*La Plaza Defense League v. Kemp*, 742 F. Supp. 792, 807, note 13 (S.D.N.Y. 1990):

> "While Rule 65(c) appears to be mandatory, courts may decline to
> require the posting of a security bond."

Similarly, as is set forth in 11A Wright, Miller and Kane, *Federal Practice and Procedure*, Sec.

2954 (1995 ed.):

> "Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant."

See also: *Doctor's Associates v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); *Kamine/Besicorp. Allegany L.P. v. Rochester Gas & Electric Corp.,* 908 F. Supp. 1180, 1193 (W.D.N.Y. 1995)(the court dispensed with a bond when granting a temporary restraining order noting that it did not appear that the defendant would suffer any long term harm if it turned out that the restraining order was wrongly granted); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir. 1974) *cert. denied,* 94 S. Ct. 2644, 417 U.S. 932, 41 L. Ed. 2d 236 (1974)("[T]he district court may dispense with security when there has been no proof of likelihood of harm to the party enjoined."); *Fleet National Bank v. Trans World Airlines,* 767 F. Supp. 510, 519 (S.D.N.Y. 1991)(bond dispensed with when court believed movant acted in good faith and could not be liable to defendant).

Under the facts and circumstances in this case, there is no reasonable possibility that ACTI will suffer any monetary damages as a result of being compelled to comply with its contractual obligations. There is no likely possibility that ACTI will suffer any harm if the injunction is granted and Alpha Capital obtains the stock to which it is entitled. The Court, therefore, should dispense with the requirement of the bond.

<u>Conclusion</u>

For the foregoing reasons, the Court should award the relief requested in Plaintiffs' Order to Show Cause.

Respectfully submitted,

Law Offices of Kenneth A. Zitter

By _____

Kenneth A. Zitter, Esq.

Attorneys for Plaintiff

Alpha Capital Anstalt
260 Madison Avenue, 18th Floor
New York, New York 10016
212-532-8000
KAZ-3195

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
CELESTE TRUST REG.,

                    Plaintiff,

         - against -                              **ORDER**
                                                  01 Civ. 91 (DAB)
GREYSTONE DIGITAL TECHNOLOGY,
INC.,

                    Defendant.
------------------------------------------------X

WHITMAN KNAPP, SENIOR DISTRICT JUDGE
(Designated Part I Judge)

For good cause as stated on the record at our hearing, we hereby ORDER that,
pending final determination of this litigation, defendant Greystone Digital Technology, Inc.
must honor all requests for conversion of the Greystone Series A Convertible Preferred Stock
held by plaintiff Celeste Trust Reg. into the common stock of Greystone, in accordance with
the express terms of the Series A Convertible Stock Purchase Agreement dated May 18,
2000. *See Halifax Fund, L.P. v. Response USA, Inc.* (Del. Ch. May 13, 1997) No. Civ. 15553
(unpublished order) (specific performance of contractual right to conversion).

However, we grant defendant's request to have plaintiff post a bond or security for
damages and costs. Although neither party brought it to our attention during the hearing,
under Fed. R. Civ. P. 65(c) we must not except in extraordinary circumstances order a
preliminary injunction unless the applicant gives such security. *See Doctor's Assocs., Inc.
v. Distajo* (2d Cir.) 107 F.3d 126, 136, *cert. denied*, 522 U.S. 948 (1997); *Pharmaceutical*

EXHIBIT A

*Soc'y v. New York State Dep't of Soc. Servs.* (2d Cir. 1995) 50 F.3d 1168, 1174-75. Plaintiff is based in Liechtenstein and maintains some illiquid investments. Furthermore, the National Association of Securities Dealers (NASD) has commenced an investigation into possible illegal market manipulation by at least some of the purchasers of the convertible stock. While we recognize that the parties contracted to dispense with security, the Federal Rules require us to balance the potential hardship to the parties. Accordingly, we ORDER plaintiff to post security in the amount of $500,000 for the payment of such costs and damages as may be incurred or suffered by defendant if a court later rules that defendant has been wrongfully enjoined.

Defendant has expressed an interest in an expedited discovery schedule. We leave such matters to the discretion of Judge Batts, to whom this case is assigned.

**SO ORDERED.**

January 12, 2001
New York, New York

WHITMAN KNAPP, SENIOR U.S.D.J.
PART I JUDGE

-2-

6bt7lonm                                                                    1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------x

3    LONGVIEW SPECIAL FINANCE, INC.,

4                   Plaintiff,

5          v.                                06 Civ. 1772

6    INFINIUM LABS, INC.,

7                   Defendant.

8    --------------------------------x

9
                                       November 29, 2006
10                                     2:00 p.m.

11

12   Before:

13                   HON. RICHARD J. HOLWELL

14                                     District Judge

15                        APPEARANCES

16   KENNETH A. ZITTER
          Attorney for Plaintiff

17   HELLER HOROWITZ & FEIT, P.C.
          Attorneys for Defendant Michael Bachner
18   BY:  RICHARD F. HOROWITZ
          JOSEPH SCHICK

19

20

21

22

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                        EXHIBIT  B

6bt7lonm

1   outstanding.  I don't know whether any shares have been issued

2   since then, or I don't know anything about that, Judge.

3          THE COURT:  So you have somewhere in the ballpark of

4   200 million shares authorized but unissued?

5          MR. HOROWITZ:  I think it's like 220 million.

6          MR. ZITTER:  Your Honor, that's as of June 30.  I know

7   other shares have been issued, I just don't know how many.

8          MR. HOROWITZ:  Well, you know more than I do then.

9          MR. ZITTER:  You represent the company.

10          MR. HOROWITZ:  I said, you know more than I do.  I

11   don't know.

12          THE COURT:  All right.  Well, I understand the issues.

13   Are there any other points that you would like to make,

14   Mr. Horowitz and Mr. Schick?

15          MR. HOROWITZ:  No, sir.

16          THE COURT:  All right.  The court then is going to

17   rule on the motion for a preliminary injunction, and I will

18   read that ruling into the record, and then we can come back to

19   the issue of the specific relief.

20          Before me is plaintiff's motion for a preliminary

21   injunction under Rule 65 of the Federal Rules of Civil

22   Procedure and 28 United States Code, Section 2201.

23          Plaintiff seeks an order directing Infinium to deliver

24   to it slightly less than 1.85 million shares; directing

25   Infinium to honor all future conversion notices duly submitted;

6bt7lonm

1    and enjoining Infinium from issuing any of its shares of stock

2    to anyone other than to Longview until it has authorized and

3    reserved sufficient shares to honor the conversion of all of

4    Longview's debentures and warrants.

5         It is well established that a party seeking a

6    preliminary injunction must demonstrate, one, irreparable harm

7    in the absence of an injunction; and, two, either a likelihood

8    of success on the merits or sufficiently serious questions

9    going to the merits to make them a fair ground for litigation

10   and a balance of the hardships tipping decidedly in the

11   movant's favor.  *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375

12   F.3d 190, 192 (2d Cir. 2004).

13        Where a party seeks an injunction that will alter

14   rather than maintain the status quo, the party must meet a more

15   rigorous standard and demonstrate a "clear" and "substantial"

16   showing of likelihood of success.  *Tom Doherty Assocs. v. Saban*

17   *Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).

18        Whether an order compelling a party to comply with the

19   contractual agreement maintains or alters the status quo is not

20   obvious, and depends on which party's view of the status quo

21   one considers.  However, the court need not decide which

22   standard applies because it finds that the plaintiff satisfies

23   the higher standard.

24        With respect to the likelihood of success on the

25   merits, Longview contends that its likelihood of success is in

6bt7lonm

1   fact overwhelming.  The debentures contain clear and
2   unequivocal provisions which obligate Infinium to deliver
3   common stock upon request.  The debenture provides: "At any
4   time after the commencement date and prior to the time this
5   debenture is paid in full in accordance with its terms... the
6   holder of the debenture is entitled, at its option... to
7   convert this debenture at any time into shares of common
8   stock."  (Debenture paragraph 4A).

9          On September 19, 2006, Longview delivered a conversion
10  notice to Infinium seeking delivery of 1,849,658 shares of
11  common stock.  Infinium failed and refused to deliver the
12  stock.  Longview further points to an admission made by
13  Infinium that it was in default of its obligation to deliver
14  shares under a prior conversion notice given in the summer of
15  2005.

16         Longview also argues that Infinium violated a
17  provision in its securities purchase agreement requiring it to
18  authorize and reserve 150 percent of the shares of common stock
19  necessary to meet all its obligations to convert debentures and
20  deliver stock upon exercise of the warrants.

21         With respect to the issue of irreparable harm,
22  Longview points out that the debentures and security purchase
23  agreements state that a breach would constitute irreparable
24  injury and, further, that the non-breaching party would be
25  entitled to an injunction.

1       Second, Longview argues that because Infinium is
2  presently insolvent and may not be in existence by the end of
3  the litigation, any potential monetary judgment awarded at the
4  end of the litigation could be uncollectable.
5       Third, Longview argues that monetary damages are not
6  an adequate remedy for a breach by a public corporation of the
7  terms of its publicly held securities and points to a series of
8  cases concerning convertible securities where the court held
9  that compelling compliance with the terms of the agreement was
10 the appropriate remedy.
11      In response, Infinium contends that Longview cannot
12 meet the higher standard necessary for a mandatory preliminary
13 injunction.  First, it offers as an affirmative defense to the
14 breach of contract claim that Longview was engaged in a scheme
15 to manipulate its stock prices by short selling, so that it
16 could demand conversion at a lower price, a so-called "death
17 spiral" funding scheme.  This defense, it argues, undermines
18 Longview's showing of the substantial likelihood of success on
19 the merits and requires discovery before any injunctive relief.
20      Second, Infinium contends that damages are an adequate
21 remedy because the shares are freely traded on the public
22 market.  It defines the damages to be readily calculable and
23 not particularly high -- in the vicinity of $8,000.
24      Third, Infinium argues that even were Longview to have
25 made a showing sufficient to warrant a preliminary injunction,

6bt7lonm

1   it is only entitled to relief ordering the delivery of 1.85

2   million shares due from the September 2006 conversion.

3        Finally, Infinium contends that the court should not

4   award injunctive relief, because doing so would result in a de

5   facto takeover of Infinium by Longview and other investors

6   involved in the alleged scheme.

7        Having considered the arguments of counsel and the

8   evidence presented on the preliminary injunction motion, the

9   court finds that Longview has demonstrated a substantial

10  likelihood of success on the merits and irreparable harm in the

11  absence of the injunction.

12       The debentures clearly state that holders could

13  convert debentures to common shares upon a notice of

14  conversion.  This contractual right was absolute; it did not

15  limit the right of conversion on the basis of a decline in

16  market price, upon the short sales of the stock, or upon

17  whether conversion would result in a transfer of corporate

18  control.

19       Infinium alleges no representations by Longview,

20  express or implied, that it would not make short sales of the

21  stock, or that it would not convert debentures if share prices

22  fell below some threshold.  Therefore, Longview's right to

23  convert became unconditional when it duly submitted its notice

24  of conversion on September 19, 2006.  *See Halifax Fund, L.P. v.*

25  *Response USA, Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997).

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Under basic contract principles, there may be
2     situations where the short selling of stock provides a defense
3     to the enforcement of conversion rights under a contract, as
4     when the debentures holder made misrepresentations during the
5     negotiations or where the contract bars such actions.   In this
6     case, however, Infinium has failed to allege with any
7     specificity facts supporting a defense of misrepresentation or
8     breach of contract by Longview, and has produced no real
9     evidence to support such allegations.   The sketchy allegations
10    and limited evidence presented by Infinium are insufficient to
11    defeat Longview's substantial showing of likelihood of success
12    on a breach of contract claim.

13         The defendant claims that it needs additional
14    discovery in order to establish its defense, and that may be
15    so, however, at the preliminary injunction stage defendant and
16    of course plaintiff were entitled to seek expedited discovery
17    in support of or in opposition of a preliminary injunction
18    motion, and neither party sought such discovery.   Therefore,
19    the court must make its determination based on the evidentiary
20    showing made to date.

21         The court further finds irreparable harm for a number
22    of reasons:  First, the contract drafted by the parties states
23    that there is irreparable harm.  While such a stipulation is
24    not dispositive, it is entitled to some weight.  See Ticor
25    Title Insurance Company v. Cohen, 173 F.3d 63, 69 (2d Cir.

6bt7lonm

21

1    1999).  Second, Longview has made an adequate showing that
2    Infinium is insolvent and likely could not pay monetary damages
3    awarded at the conclusion of this litigation.  See Brentag
4    International Chemicals, Inc. v. Bank of India, 175 F.3d 245,
5    250 (2d Cir. 1999).  Third, courts in this district have found
6    that ordering compliance with the terms of a security contract
7    is an appropriate form of relief in cases such as this, and
8    monetary damages are not an adequate remedy.  In particular,
9    the court notes two decisions:  Alpha Capital v. Advanced Viral
10   Research Corp., 2003 WL 328302 (S.D.N.Y. Feb. 11, 2003) and
11   Alpha Capital v. Group Management Corp., 2002 WL 31681798
12   (S.D.N.Y. Nov. 25, 2002).  Compelling compliance rather than
13   simply awarding damages reinforces the sanctity of bargains
14   between corporations and creditors and investors and is
15   consistent with the debenture holders' potential excise of
16   their rights as equity shareholders.

17        Therefore, Longview is entitled to injunctive relief.
18   The court, however, is sympathetic to defendant's argument that
19   the relief sought is overbroad.  With this in mind, the court
20   enters an injunction directing Infinium to deliver to Longview
21   1,849,568 shares of Infinium common stock and to do so
22   immediately.

23        Infinium is also directed to honor all future
24   conversion notices duly submitted by Longview and all future
25   exercises of warrants duly submitted by Longview.

92AAAALPC                          Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALPHA CAPITAL ANSTALT,

                    Plaintiff,

            v.                                    09 CV 670 (LAK)

ADVANCED CELL TECHNOLOGY,
INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                         New York, N.Y.
                                         February 10, 2009
                                         3:00 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                              District Judge

                         APPEARANCES

KENNETH A. ZITTER
     Attorney for Plaintiff Alpha

BACHNER & ASSOCIATES, P.C.
     Attorneys for Defendant Advanced Cell
BY:  MICHAEL FRED BACHNER

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

92AAAALPC                    Conference                         2

1          (Case called)
2          MR. ZITTER:  Kenneth A. Zitter, 260 Madison Avenue,
3     New York, New York, counsel for plaintiff Alpha Capital
4     Anstalt.
5          MR. BACHNER:  Good afternoon or good morning,
6     actually, your Honor.
7          Michael Bachner.  With me is Kevin O'Brian.  We
8     represent Advanced Cell Technology.
9          THE COURT:  Good morning.
10         Okay.  Does the plaintiff have any more evidence to
11    present?
12         MR. ZITTER:  Well, your Honor, last time we were here
13    you said you wanted to hold a hearing.  I have Mr. Rabinowitz
14    here physically in court.  He is the one who signed the aff --
15    one of the affirmations in support of the order to show cause.
16    I don't think there is any dispute about the facts but if your
17    Honor wants live witness testimony --
18         THE COURT:  I couldn't quite follow the whole
19    sentence.  You said you didn't think there was any dispute
20    about the facts --
21         MR. ZITTER:  Right, about the facts that
22    Mr. Rabinowitz put forth in the affirmation.  So I don't know
23    if it advances the ball to have him testify but he is available
24    to testify if your Honor would prefer live testimony.
25         THE COURT:  I don't have to listen to something that
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

92AAAALPC                         Conference

1    I've read already.  So it's really going to be up to
2    Mr. Bachner if he feels he needs to cross-examine
3    Mr. Rabinowitz.
4             MR. BACHNER:  Your Honor, we're satisfied actually
5    that the papers set forth accurately Mr. Rabinowitz's position
6    as well.
7             THE COURT:  OK.  Fine.  Thank you.  So is there any
8    other evidence for the plaintiff?
9             MR. ZITTER:  No, your Honor.
10            THE COURT:  Okay.  Then I'll hear Mr. Bachner's side.
11            MR. BACHNER:  Thank you, your Honor.
12            Your Honor, we're here in front of you today, frankly,
13   we were hoping that we would be in front of you today telling
14   you that this matter had been resolved.  My office through
15   Mr. O'Brien --
16            THE COURT:  You were not alone in that.
17            MR. BACHNER:  I know, your Honor.  And we were working
18   fairly diligently with Mr. Zitter at some really long hours
19   over the course of the weekend.  And, frankly, your Honor, we
20   thought that as of nine o'clock this morning that this was
21   going to be resolved.  A glitch came about, your Honor, in some
22   of the dealings with Mr. Caldwell's other corporate counsel
23   about concerns that they had in connection with the settlement
24   issues.  And we thought it was appropriate, your Honor, even
25   though Mr. Ryan indicates to me that he thinks you may have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    actually in some way addressed this last time. And if you did
2    I apologize to the Court and if you have addressed it, your
3    Honor, whatever order your Honor issues we will abide by, of
4    course, and so will the company.
5         MR. Caldwell, your Honor, frankly, would have been
6    here. We hoped that this was going to be resolved and he
7    didn't have to incur, the company didn't have to incur the
8    expense of coming down here. Mr. Caldwell if you want to speak
9    to him about any questions that your Honor may have he is
10   available by phone to do that.
11        THE COURT: This is not an inquisitorial process.
12   There's been a motion made. You've put in no papers in
13   opposition. If you want to put on a witness I'll certainly
14   hear that. So the ball is in your court.
15        MR. BACHNER: That's fine, your Honor. We thought you
16   might have been questions of Mr. Caldwell that we're weren't
17   ready to answer. We're ready to answer them today. You had
18   questions for Mr. Ryan. I don't know if it's necessary. We
19   didn't mean any disrespect to the Court by not having him here.
20        THE COURT: I appreciate that. I had a lot of
21   questions. I wanted to know whether the financial condition of
22   the company is any better or worse today than it was as of
23   March 31, 2008 when it filed it's last queue. I wanted to know
24   about the amount of shares authorized issued and outstanding
25   were.

92AAAALPC                      Conference                          5

1      MR. BACHNER:  We have that information, your Honor.
2   We have it through certification by Mr. Caldwell and he is
3   ready to go on the phone and tell it to your Honor.
4      THE COURT:  What do you mean?
5      MR. BACHNER:  As part of what was going to be the
6   original settlement Mr. Caldwell put together a certification
7   by him indicating how many outstanding shares there were.
8   There were five hundred million shares outstanding, your Honor,
9   authorized actually.  And there are six million shares, your
10  Honor, not yet issued.
11     THE COURT:  So you've issued four million nine hundred
12  and 94 million?
13     MR. BACHNER:  Yes, your Honor.  And there's six
14  million shares -- actually, your Honor, there were 493,805,641
15  shares.
16     THE COURT:  493,895 and what?
17     MR. BACHNER:  641, your Honor.
18     THE COURT:  That's what's issued and without standing?
19     MR. BACHNER:  That's correct, your Honor.
20     THE COURT:  So the balance that are authorized but not
21  yet issued is six million, right?
22     MR. BACHNER:  I apologize, your Honor.  I spoke over
23  you.
24     THE COURT:  The authorized but not yet issued are
25  about six point two million?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92AAAALPC                    Conference                              6

1        MR. BACHNER:  Correct, your Honor.
2        Judge, this was the glitch that put us up and whatever
3   your Honor rules on this we will abide by of course.
4        One of the provisions, and it was brought up in the
5   motion papers, has to do with this giving preference to other
6   debenture holders.  There are other debenture holders who are
7   in the same position.  Although, they haven't come to court yet
8   regarding their situation as well.  On page --
9        MR. ZITTER:  Your Honor, I don't mean to interrupt
10  Mr. Bachner but he is testifying, your Honor.  He is giving
11  basically testimony as to what the facts are.  He doesn't know
12  them.  He is not sworn.  He doesn't have a witness here.
13       THE COURT:  One of the things that I was going to
14  inquire of you, Mr. Zitter, at least to the point that he had
15  gone so far, the shares authorizes issued and outstanding.  Do
16  you have any quarrel with accepting those numbers?
17       MR. ZITTER:  Yes, I do, your Honor.  I have serious
18  quarrel with it.  First of all, we have no basis to know if
19  it's true or false.
20       Second, on Friday immediately after the hearing that
21  we had on that day I sent an e-mail to Mr. Bachner's office
22  saying send me the documentation which shows the shares which
23  were issued which were outstanding and how many are left.  I
24  don't have any documents, your Honor.  I don't know whether it
25  is true or not.  In the course of our settlement negotiations I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92AAAALPC                     Conference                      7

1   heard at least four different numbers of how many shares were
2   authorized but as yet unissued.  I have no basis to say.
3   There's no witness here to give testimony about it, your Honor,
4   and I would object.
5        MR. O'BRIEN:  Your Honor, Mr. Zitter did ask for
6   information regarding the outstanding shares.  As part of our
7   settlement negotiations he drafted a certification for
8   Mr. Caldwell to fill out regarding number of shares that are
9   outstanding and the number of shares that had been issued as of
10  February 9 which was the date that he had asked for.  That
11  certification we received late last night while we thought we
12  were still in the process of settling.  I have that with me
13  today, your Honor.  That was certified and notarized by
14  Mr. Caldwell in direct response to Mr. Zitter's question in
15  that regard.
16       THE COURT:  So presumably you want to offer it, right?
17       MR. O'BRIEN:  That's correct, your Honor.
18       THE COURT:  Mark it as Defendant's Exhibit A.
19       MR. BACHNER:  Should we approach?
20       THE COURT:  Yes.  Show it to Mr. Zitter first.
21       (Pause)
22       MR. BACHNER:  Your Honor, just so we're clear, we did
23  offer to show this to Mr. Zitter before court and he said he
24  wouldn't accept it or look at it.  We're not --
25       MR. ZITTER:  I would object to the introduction into
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

92AAAALPC                          Conference                          8

1    evidence, your Honor.  It's pure hearsay.  We've asked for the
2    documents which back it up.  They have not been provided to us
3    and Mr. Caldwell is not in court to be subject to
4    cross-examination.
5           MR. BACHNER:  Your Honor, while we agree he is not
6    physically here, he is available by telephone, your Honor, to
7    be cross-examined and placed under oath.
8           Your Honor, if I might just continue, the position
9    that we found ourselves, that is, the company found themselves
10   in, is that under the provisions of the agreement that we all
11   agree exists, I mean the provision itself, there is a provision
12   which essentially, which does indicate all purchasers have to
13   receive equal treatment and the concern that we had, your
14   Honor, is that by issuing the six million shares --
15          THE COURT:  What provision are you referring to?
16          MR. BACHNER:  It's on page 31 of Exhibit P.  It's
17   paragraph 4.15.  Starts off --
18          THE COURT:  I am trying to read it.
19          MR. BACHNER:  I'm sorry.
20          (Pause)
21          THE COURT:  I've read it.  How does that bear on
22   honoring a right to convert the debenture into stock?
23          MR. BACHNER:  The concern that had come up, your
24   Honor, was that by issuing all of, by giving all of the
25   outstanding remaining shares to Alpha we are, in fact,
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   violating the terms of the agreement indicating that we are not
2   to be given, that all of the purchasers are to be given equal
3   treatment and that we're not permitted, your Honor, to offer
4   consideration to one purchaser that is not offered to another.
5       THE COURT:  But, Mr. Bachner, you are not reading the
6   same paragraph I am reading if you think it says that.  The
7   first sentence says, no consideration shall be offered or paid
8   to any person for a particular purpose.  That particular
9   purpose is to amend or consent to a waiver or a modification of
10  any transaction documents unless the same consideration is
11  given to others.
12      Now, honoring a debenture holder's contractural right
13  to convert the debenture holder's election, the debentures into
14  common stock does not constitute the payment of any
15  consideration, I think.  But even if it did, it would be for a
16  purpose different than the one that the first sentence of
17  Section 4.15 speaks to, wouldn't it?
18      MR. BACHNER:  Which is waiver or amendment.  Which is
19  amendment or --
20      THE COURT:  Waiver or amendment of the transaction
21  document.
22      MR. BACHNER:  As I understand it, your Honor, the
23  problem that we had with those words was that the amount, the
24  price at which the debentures was going to be converted over
25  was at two cents.  As we understand it, the debenture agreement

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92AAAALPC                    Conference                        10

1  was that either it was that I think the lowest price was 15
2  cents. So we were amending the agreement to give the
3  debentures at a price substantially lower than what was
4  reflected in the agreement.
5       THE COURT: I don't understand that.
6       MR. BACHNER: Your Honor, I am going to be very
7  candid. Mr. O'Brien, if he could address that I would
8  appreciate that.
9       THE COURT: All right.
10      MR. O'BRIEN: Your Honor, because as the plaintiffs
11 are alleging the conversion price would be reduced to two cents
12 per share because of other issuances that trigger the -- I'm
13 sorry. I don't have it in front of me at this moment. Under
14 the subsequent equities sales provision in both of the
15 debentures at page 13 of Exhibit A the conversion price is
16 being reduced to reflect the subsequent issuance of shares at a
17 price below the conversion price of the debentures and
18 therefore --
19      THE COURT: I don't understand. The conversion price
20 of the debentures?
21      MR. O'BRIEN: The conversion price of the debentures
22 depending on the debenture on the face value is either 35 cents
23 or 15 cents. The argument that plaintiffs are advancing is
24 that that advance sale issued shares to a third party at two
25 cents per share and thus the subsequent equity sales provision

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1   of the debentures is triggered.
2       THE COURT:  And therefore if the company converts at
3   two cents it is doing so pursuant to the expressed terms of the
4   debenture and the shares that are being issued are not
5   consideration for any modification or waiver of any provision
6   of the debenture agreement.  They're being issued in strict
7   conformity of the debenture, right?
8       MR. O'BRIEN:  Yes, your Honor, I understand.
9       THE COURT:  Okay.  So the first sentence here doesn't
10  have anything to do with this and neither does the second
11  sentence I think because there's nothing involved in the
12  conversion of the debentures pursuant to which the company is
13  making any payment of principle on the debentures; isn't that
14  right?
15      MR. BACHNER:  Your Honor, we understand what your
16  Honor is saying, yes.
17      THE COURT:  And I am correct, am I not?
18      MR. BACHNER:  We do not disagree with your Honor's
19  finding.
20      THE COURT:  Okay.  And therefore this Section 4.15 has
21  nothing to do with the subject at hand.  You are simply
22  obliged, as far as I can see the documents, to honor the
23  notices of conversion, right?
24      MR. BACHNER:  We agree your Honor and the concern that
25  we had was without some kind of judicial comment on that we

92AAAALPC                    Conference                        12

1   didn't want, even though we frankly tended to agree, there were
2   people that did not on the conversion end, and we agree with
3   your Honor we just did not want the position of having some
4   domino effect coming over.  And our position is that this in
5   fact may not have been a trigger but there were other attorneys
6   for the company --
7             THE COURT:  So when you say this in fact may not be a
8   trigger what is the "this" that you are referring to?
9             MR. BACHNER:  Your Honor, we are in agreement in our
10  initial reading which is why frankly we had proceeded so far in
11  settlement discussions that the reading that your Honor gave
12  was certainly a reading that counsel tended to agree with.
13            The problem is, your Honor, that we had some
14  disagreement and we felt it appropriate that if we were going
15  to issue the shares it be pursuant to a ruling by the Court
16  that we do so.
17            THE COURT:  When you say you had some disagreement,
18  you mean there were other people who didn't agree with you.
19            MR. BACHNER:  Correct.  And we felt, your Honor, that
20  the most important thing is we for reporting requirements,
21  etc., your Honor, to be able to going back to the other
22  debenture holders and say we don't believe we are in violation
23  of this provision.  If the want to litigate it they can
24  litigate it.
25            THE COURT:  I understand that.  So the only remaining

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    question goes to, I believe, goes to the subject of irreparable
2    injury.  What else is to be said on that subject?
3              MR. ZITTER:  Your Honor, may I be heard just briefly
4    on that?  Mr. Rabinowitz is here and his affirmation, but I
5    think two things are important to state.  Number one and
6    Mr. Caldwell told him that the company's on the verge of
7    bankruptcy so that --
8              THE COURT:  This is a recent statement?
9              MR. ZITTER:  Yes, your Honor.  It's in his e-mail.  I
10   think it was a conversation on or about January 13th but he is
11   here to testify about it and that he would not honor a
12   conversion requests.  He would not honor the obligation to
13   reserve shares for the benefit of the debenture holders as they
14   agreed to do with the documents.  It is crystal clear that if
15   all we get here is the money judgment we will never see our
16   money.  There are no assets from which to collect.  The company
17   is on the verge of bankruptcy.  And if all we get and indeed I
18   think -- judgment we will go into bankruptcy.  So there is no
19   way we are going to get paid.  In my mind that's ultimate
20   irreparable harm and the Second Circuit other cases have had to
21   brief that.
22             Even more than that, your Honor, they agreed to do all
23   this stuff.  We are not asking them to do something.  They
24   didn't agree.  They agreed to reserve shares for our benefit.
25   They just ignored that obligation.  Other than a court order

92AAAALPC                     Conference                          14

1   saying can't issue shares to someone else until you reserve the
2   proper amount of shares for us, how can we enforce that?  If
3   all we get is damages which your Honor would in effect be
4   saying is the agreement to reserve shares is simply an
5   agreement without a remedy.  I don't believe that's true.  It
6   is a contract obligation.  We agreed to do it.
7            Your Honor, the case is beside the case which we state
8   states that irreparable injury is present when you can't
9   collect.  Also, it will be difficulty in calculating damages
10  here.  Even assuming we got the stock and went out and sold it.
11           THE COURT:  I understand that.
12           MR. ZITTER:  There is case law which we cited which
13  shows that to be irreparable injury.  And finally, a
14  corporation should be made to adhere to the terms of their
15  publicly held security.  They shouldn't make the people who in
16  invest in the companies and buy public securities chase them
17  and run around.  They should be compelled by the Court to do
18  what they agreed to and I think we established irreparable
19  injury more than sufficiently.
20           THE COURT:  Mr. Bachner, anything else?
21           MR. O'BRIEN:  Your Honor, just on the irreparable
22  injury point to address some of the issues from Friday.  Again,
23  the shares are publicly traded and the -- volume is
24  approximately 14 million shares traded per day to the extent
25  that that helps your Honor's determination.

92AAAALPC                    Conference                              15

1        MR. ZITTER:  That's also testimony by an attorney
2   without any facts, your Honor.
3        THE COURT:  Yes.  Okay.  All right.  I am going to
4   rule on this now.  I have before me a motion for preliminary
5   injunction by the plaintiff Alpha Capital Anstalt against
6   Advanced Cell Technology Inc.  The plaintiff seeks an order
7   directing Alpha Capital Technology Inc. to deliver immediately
8   2.5 million shares of its common stock to Alpha Capital and to
9   honor all future conversion requests duly submitted by Alpha
10  Capital in accordance with the agreements between the parties.
11       To declare that the conversion price of the ACTI
12  secured convertible debentures held by Alpha Capital is two
13  cents per share, subject to further downward adjustment as
14  provided in the agreement between the parties and enjoining and
15  abstaining Advanced Cell Technology additional shares of its
16  common stock to any person or entity other than Alpha Capital
17  and to other holders of Alpha Capital -- excuse me -- of
18  Advanced Cell Technology convertible debentures unless and
19  until Advanced Cell technology is in compliance with its
20  contractual obligation to reserve sufficient shares of common
21  stock or issuance to Alpha Capital and the other holders of
22  Advanced Cell Technology convertible debentures.
23       The parties have devoted the usual amount of attention
24  to the standard that governs the issuance of a preliminary
25  injunction.  I needn't spend much time on it.

92AAAALPC                    Conference                                16

1           On the issue of the plaintiff's likelihood of success,
2    on the basis of what I have seen and heard so far, the
3    plaintiff is substantially certain to prevail on the merits in
4    all respects.  We are not here talking about a claim as to
5    which there is a fair probability of, or that there are fair
6    issues, fair ground for litigation or indeed a likelihood or
7    clear likelihood of success.  Here, the plaintiff in my view is
8    substantially likely to prevail.  The only argument in fact
9    advanced on behalf of the defendant in opposition to the
10   plaintiff's case was Mr. Bachner's reference to Section 4.15 of
11   the underlying agreement which was the subject of colloquy
12   between me and Mr. Bachner.  Mr. Bachner and I have no
13   disagreement about it.  It clearly does not constitute a
14   defense to the relief sought here.  I understand he was putting
15   forward an argument that somebody else in the constellation of
16   Advanced Cell Technology wanted him to put forward and with
17   respect to that he had do that.  But there is not merit to his
18   argument.  That's not a comment on Mr. Bachner's efficacy, his
19   comment on plain language of Section 4.15.  So this is no
20   defense to the claim.
21           So far as irreparable injury is concerned, I have read
22   with care and interest the decision by my friend and colleague,
23   Judge Holwell of this court, in Mullview Special Finance Inc.
24   v. Finial Labs Inc.  It is unreported but it was rendered on
25   November 29, 2006.  The docket number is 06 CV 1772.  I agree

92AAAALPC                    Conference                    17

1   entirely with everything he said on the subject of irreparable
2   harm.  It is all fully applicable to this case.  It's quite
3   clear that the plaintiff would have no adequate remedy of law
4   in the absence of the preliminary injunction that I am going to
5   grant.  So I will issue the preliminary injunction.
6        Now, I will ask that Mr. Zitter submit to chambers,
7   hopeful by tomorrow, a proposed form of order.  The temporary
8   restraining order remains in effect pending the entry of
9   preliminary injunction and the only other question that I will
10  raise is whether anybody has anything to say on the subject of
11  a bond.
12       MR. ZITTER:  Yes, your Honor.
13       I think that there should not be a bond.  Your Honor
14  knows at the discretionary with the Court the likelihood of
15  there being damages as result of a wrongly granted injunction
16  here, your Honor.  I think are minimal at best.  I think your
17  Honor's decision is correct.  I think we're clearly entitled to
18  the injunction and as I understand it, the bond is simply to
19  protect the defendant in the event the injunction is found --
20  to be granted.  I don't think there's chance of this injunction
21  having to be found is wrongfully granted.
22       THE COURT:  I never think there is a chance when I
23  issue a ruling, but every now and then the Court of Appeals
24  engenders humility.
25       MR. ZITTER:  This is clearly it would have to be an

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
 1    abuse of discretion.  So it's not just, you would have to, I
 2    don't see that there is any damage to the defendant which we
 3    would have to protect against with a bond, your Honor.  So I
 4    would suggest that a bond be waived in this case.
 5             MR. BACHNER:  Your Honor, we rely on our paper.
 6             THE COURT:  Well, maybe you could remind me since the
 7    only paper I got was I think this Caldwell certification.
 8             MR. O'BRIEN:  Your Honor, we submitted a memo on, I
 9    believe --
10             THE COURT:  A few days ago?
11             MR. O'BRIEN:  On Thursday I believe we ECFed it, your
12    Honor.
13             THE COURT:  Maybe you will remind me.
14             MR. O'BRIEN:  Your Honor, it's our position that a
15    bond is required.
16             THE COURT:  Well, how much for what?
17             MR. O'BRIEN:  For the loss of value of the potential
18    issuance of shares to the extent that the injunction assuming
19    that the injunction is wrongfully issued there are shares, six
20    million shares that could be used by the company at the current
21    market price was 19 cents per share as of the close of
22    yesterday that could be used by the company for further
23    funding.  To the extent that the injunction was wrongfully
24    issued the company would have been deprived of the use of those
25    shares for the entire time period.  I believe the case law on
```

92AAAALPC                    Conference                    19

1   that is consistent that the loss of value of the property that
2   is enjoined is a valid basis for the bond value.
3        THE COURT:  Well, but even assuming you could raise
4   six million times 19 cents or about a million dollars through a
5   good sale of the shares which I suppose is pretty questionable
6   since the stock has been selling as low as one or two cents, if
7   you try to sell six million shares all at once you probably
8   wouldn't get anything close to 19 cents.  Let's pass over that.
9   You would get the million dollars and you would pay bills you
10  already owe, right?  The company is under water, way under
11  water; isn't that true?
12       MR. O'BRIEN:  I believe the company has significant
13  outstanding obligations, your Honor.
14       THE COURT:  Not to put too fine a point on it.  It's
15  net worth as of March 31, 2008 was minus 28 million.  Is it any
16  better than that today?
17       MR. O'BRIEN:  Your Honor, we intend to have
18  Mr. Caldwell available.  To the extent that question needs to
19  be answered as I stand here I can't answer that question.
20       THE COURT:  You mean you didn't even ask him?
21       MR. O'BRIEN:  I set forth in Mr. Caldwell's papers the
22  share price when it was two cents per share.  Significant
23  issues have occurred since then, particularly, in the last
24  month which has caused the share price to rise.  The company's
25  prospects are improving.  The company is close to becoming once

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92AAAALPC                    Conference                    20

1    again a reporting company and in the opinion of Mr. Caldwell as
2    set forth in his affirmation -- excuse me -- in his affidavit
3    with the Court is that the company is on the path to recovery
4    and at two cents per share is hopefully a thing of the past.
5              THE COURT:  Last guy I heard say that was Richard Full
6    the weekend before Lehman Brothers went down.
7              Look, it seems to me that the idea that there would be
8    the -- for a wrongful injunction is essentially speculative.  I
9    think it's conceivable that some additional capital could be
10   raised.  But in the last analysis I don't see that making any
11   material difference here.  Even if they could raise a million
12   bucks by selling six million shares for 20 cents and 19 cents a
13   share, it's just going to another creditor, that's all.  And so
14   I think what I will do is I'll require a bond be posted by next
15   Tuesday at five o'clock in the amount of $75,000.  And the
16   injunction, the TRO remains in effect until then and the
17   preliminary injunction will provide that it's continuation
18   beyond five o'clock next Tuesday will be conditioned on the
19   posting of the $75,000 by then, but it will become effective on
20   issuance.  Okay.  Thank you.
21             MR. ZITTER:  One more request.  I am not sure whether
22   we will do this or not, but in the event the binding company
23   requires collateral will it be acceptable if the company simply
24   deposited the $75,000 in my escrow account and I will hold that
25   in lieu of the bond?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92AAAALPC                    Conference                              21

1            THE COURT:  No.  It goes to the Clerk of the Court.
2            MR. ZITTER:  Generally not, your Honor.  The bonding
3     company generally issues the preliminary injunction bond.
4            THE COURT:  I understand that.  But you are saying
5     that you would like instead of a bond if I understand you
6     correctly for you to have $75,000 in your escrow account.
7            MR. ZITTER:  I will hold it in lieu of the bond,
8     whatever conditions the preliminary injunction bond would be
9     usable for.
10           THE COURT:  That not acceptable.  Either you produce a
11    bond or you deliver $75,000 to the clerk who will hold it.
12           MR. ZITTER:  That's fine.
13           THE COURT:  That's the way I always do it.  This is
14    not.
15           MR. ZITTER:  Off the record.  Off the record, I've
16    done that before, but so be it.
17           THE COURT:  If your adversary is content to do it that
18    way.
19           MR. BACHNER:  I always tend to agree with the Court in
20    these conditions.
21           Nice to see you again, your Honor.
22           THE COURT:  Likewise.
23                            o  0  o
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300